**STATE of Minnesota, Respondent,**

v.

**Luis Candalario MITJANS, Appellant.**

**No. C4–85–2319.**

Court of Appeals of Minnesota.

Oct. 7, 1986.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Tom Johnson, Hennepin Co. Atty., Beverly J. Wolfe, Asst. Hennepin Co. Atty., Minneapolis, for respondent.

William R. Kennedy, Hennepin County Public Defender, Philip D. Bush, Asst. Public Defender, Minneapolis, for appellant.

Heard, considered and decided by POPO-VICH, C.J., and WOZNIAK, and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Appellant, Luis Candalario Mitjans, was charged with second degree murder/felony murder (Minn.Stat. § 609.19(2)), second degree murder/intentional (Minn.Stat. § 609.-19(1), and second degree assault (Minn. Stat. § 609.222). (The murder charges involve the death of Mark Chapman, and the assault charge involved Chapman's companion, Mark Froiland). Appellant asserted self-defense on the assault charge and accidental death as a defense to the homicide counts. A jury acquitted appellant of intentional murder but convicted him of felony murder and second degree assault.

The appeal is from judgment of conviction. At issue are admission of a statement translated by a police officer, mistranslation of trial testimony, jury instructions, and a sentencing departure. We reverse the convictions due to the cumulative impact of trial errors and remand for trial.

## FACTS

On February 27, 1985, following an argument at a bar in south Minneapolis, Michael Chapman received two gunshot wounds, one to the abdomen and a second fatal wound to the head. Appellant does not dispute that he fired the shots.

Appellant is from Cuba and speaks and understands little English.

The early evening of February 27, 1985, appellant met a Cuban friend of his, Jose Monzon Lorenzo, who is known by the nickname Pelancho. They went to drink in some of the local bars in south Minneapolis. That evening, they met two friends of Pelancho—Deanna Dionne and Jeannie Goodthunder. They arrived at Casey's Bar about 8:30 p.m.

Appellant lived near Casey's Bar. After spending some time at Casey's, he went home. While at home, he injected cocaine, got his gun, and returned to Casey's. Appellant testified that he got his gun because he was scared. He described his fears that night by referring to three incidents: he had been assaulted from behind, had the tendons in his hand sliced, and had been robbed by three men and a woman. He returned to the bar after about half an hour. At this point in the evening, all witnesses agree that appellant had not exchanged angry words with anyone.

Upon returning to the bar, appellant played pool with Dionne and all four drank beer. The bartender testified that the four were drinking their fourth pitcher of 3.2 beer at the time of the incident. Dionne testified that she had eight beers at Casey's, in addition to her earlier drinking. Goodthunder had about ten beers that night.

Sometime between 10:00 and 10:40 p.m. Mark Howell and Greg Howell arrived at Casey's and had their first drinks of the evening. Just after 10:45 p.m. Mike Chapman and Mark Froiland arrived. Chapman was 5′8″, bearded, and weighed 158 pounds. Appellant described both men as stronger than himself. The bartender testified that Chapman and Froiland had been drinking before they came to the bar. The autopsy of Chapman showed a blood alcohol level of .20. The medical examiner testified that this was very significant intoxication.

Upon arriving, Chapman and Froiland took seats at the bar and began drinking. Appellant testified that while walking to the bathroom he had to walk past Chapman and Froiland at the bar. Appellant heard Froiland call him a "motherfucker" and "nigger" and other words which he could not understand. Froiland said these words with a "contracted face," was angry and showed his teeth. Appellant said that he was "offended."

Appellant called Dionne over to the bar to try to find out what the man was saying. Appellant could not understand the conversation between Dionne and Froiland, but heard "motherfucker" and "nigger." Froiland also moved his hands in some unspecified manner in appellant's face, which scared appellant. Appellant took two steps backward and pulled his gun from under his belt. Appellant said he wanted to "coerce" Froiland[1] and he thought the problem was going to finish. Appellant testified that he showed the gun because he felt threatened, was afraid, and thought that this would make Froiland leave him alone and end the problem.

Appellant denied pointing the gun at Froiland's head, but other witnesses testified that appellant touched Froiland's head with the gun. At this point, Froiland began walking toward the adjacent pool room. A fight started between Froiland

and Pelancho. Appellant testified that he remained in place with the gun pointed at the floor.

Appellant testified that Chapman then got up, put one hand on appellant's throat and the other on the gun. The bartender testified that Chapman lunged at appellant and they struggled for the gun. While they were struggling, the gun went off. Appellant characterized it as an "accident." Chapman then fell back onto his knees. Appellant testified that Chapman then stood up and came forward "to tackle me."[2] Appellant demonstrated this by having his hands outstretched, his head bent and leaning forward. Appellant testified that he was "scared" and afraid that Chapman would attack him again and take the gun away. Appellant also testified that he was afraid of a "blow to my stomach that can cause me a serious problem." Appellant has stomach cancer, for which he has undergone surgery and other treatment. Appellant fired the gun again. Chapman fell to the floor. This second shot entered his head above and behind the right ear and proved fatal. Pelancho urged appellant to leave, which he and the other three in his party did.

Other witnesses gave different accounts of the events. The bartender heard a verbal confrontation between appellant and Froiland:

> [Appellant] was not understanding him, and he stood there and said, "No speak English. No, No, No." At that point [Froiland] said, "Oh screw it. I've heard that line before. It's all the same." And he brushed him back [on appellant's shoulder] with his hand and turned back to face the bar then.

Pelancho then stepped between Froiland and appellant, and Pelancho and Froiland pushed each other toward the game room. The bartender heard appellant say, after appellant drew his gun, "You want to be tough. I show you tough." and described

---

1. Appellant disputes the accuracy of this translation, as discussed later. Appellant claims that the correct translation is "to caution."

2. Appellant also disputes the accuracy of this translation, as discussed later. Appellant claims that the correct translation is "to attack like a charging like a bull."

the altercation between Chapman and appellant:

> [Chapman] went and made a lunge for [appellant], and he grabbed him by the wrist, the upper hand and the two of them then struggled for the gun and they moved down the bar this way towards that wall.

The bartender heard two gun shots, about three seconds apart, but he did not see the shots fired.

Mark Howell testified that Froiland told appellant, "Don't give me any of this I don't understand English." Pelancho tried to intervene, but was pushed aside by appellant. Appellant approached Chapman and touched the gun to his face. Froiland then ducked and knocked his hat off. Chapman and appellant then began struggling. Mark Howell heard the two shots, but did not see them fired.

Gregory Howell gave testimony similar to his brother's, but added that he heard Froiland swear at appellant, saying "Stay the fuck out of my face."

Dionne testified that appellant pointed the gun at Froiland. She saw appellant shoot Chapman the first time, then saw appellant point the gun at Chapman's head and shoot him while Chapman was still on the ground. Appellant was about two feet from Chapman when he fired the second shot.

Goodthunder testified that Dionne told her at Casey's bar that there was going to be a fight "and its going to be over me." She testified that just before the first shot, Pelancho had his hand on appellant's arm, which was holding the gun. Chapman, who was one to two feet away from appellant, pushed appellant. Appellant then pushed Chapman and the gun went off. Goodthunder did not see the shots, but heard them.

The trial court admitted into evidence a statement appellant made to police the day of his arrest. Appellant had unsuccessful-

ly objected to admission of the statement at the omnibus hearing. He unsuccessfully moved for a mistrial due to admission of the statement and included it as a basis for his unsuccessful new trial motion.

Officer Anatoli Globa and two police lieutenants interviewed appellant. Globa acted as interpreter. He learned Spanish while growing up in Argentina. Globa talked with appellant *off-the-record,* informing appellant of his *Miranda* rights in Spanish. Globa identified himself and the lieutenants as police. After the initial interrogation, appellant agreed to give a written statement. A lieutenant asked questions in English and Globa translated them into Spanish. Appellant then responded in Spanish and Globa translated the responses into English. The English question and answers were taken down by a stenographer. No tape recording of the session was made, although equipment was readily available. Nor did Globa write down the questions and answers in Spanish so that appellant could review a written statement, even though Globa was capable of doing so. Globa read the entire English statement back to appellant, translating it into Spanish. Appellant took an oath that it was true and signed it.

Globa took no oath to translate accurately before he translated. Globa did testify at trial that he accurately translated what appellant said. Globa could not recall the Spanish words used by appellant during the interrogation.[3]

Appellant testified that the statement did not accurately reflect his conversation with Globa. He denied saying a number of things attributed to him and testified that "there is an error in those documents that he did not write it down the way I told him." When asked about an admission in the statement that he shot a man at Casey's Bar, he denied making it, explaining that "We talk about that but not in the way it is written."

---

**3.** Globa explained at trial:

[S]everal words can be substituted to mean different things. I do not recall his word for word. I recall that the answer here in English is the translation.

## ISSUES

1. Did the trial court err constitutionally by admitting into evidence appellant's statement to the police, which was translated by an interpreter not under oath?

2. Was appellant denied due process by mistranslations of his testimony and omissions in translation?

3. Was it error for the trial court not to instruct the jury on the issue of self-defense using 10 *Minnesota Practice*, CRIM-JIG II, 7.06 (1985) (self-defense—death not the result)?

4. Did the trial court err by not instructing the jury on the lesser-included offense of second degree manslaughter?

5. Did the trial court err by sentencing?

## ANALYSIS

### I

*Admission of confession*

Appellant rests his argument that the trial court erred in admitting into evidence the English translation of his statement on Minn.Stat. § 611.32, subd. 2 (1984), which governs use of interpreters during police interrogation of suspects:

> Prior to interrogating or taking the statement of the person handicapped in communication, the arresting officer, sheriff, or other law enforcement official shall make available to the person a *qualified interpreter* to assist the person throughout the interrogation or taking of a statement.

(Emphasis added). "Qualified interpreter" is defined by § 611.33. One requirement is that

> Every qualified interpreter appointed pursuant to the provisions of sections 611.30 to 611.34, *before entering upon his duties* as such, shall take an oath that he will, to the best of his skill and judgment, make a true interpretation * * *.

Minn.Stat. § 611.33, subd. 2 (1984) (emphasis added).

■ The State does not dispute that Globa did not take any oath before translating. The State argues that Globa took an oath before taking the stand at the trial, and claims that the subsequent oath at trial suffices under that statute. We hold that admission of the statement was error because no oath was taken by the police officer before beginning to translate appellant's confession.

Additionally, police officers actively working on the case, such as Globa here, stand at the outer limits of the statutory definition of qualified interpreter. Interpreters should be neutral and objective if at all possible. Globa had a built-in conflict of interest. He and the others had actively focused on appellant as a serious suspect in a murder and felony assault and were working to gather evidence against appellant. The police at that point should have invested time and work in attempting to find someone outside the department to translate. Because of the close relationship and natural empathy between a translator and a defendant dependent on that translator to communicate his thoughts and feelings, a translator should be someone a defendant can place trust in and rely on to protect his interests. This is an unnatural burden to place on the shoulders of a peace officer actively working to gather evidence to help convict a defendant.

The question arises whether the error is a constitutional one requiring suppression of the statement. We hold that it is. The statute stands silent concerning the consequences of violating § 611.32. We therefore may turn to the legislative intent expressed in the preamble to §§ 611.31–34. *See In Re Atkinson*, 291 N.W.2d 396, 400 (Minn.1980) ("introductory or explanatory provisions can be considered in interpreting an ambiguous statute"); *Grudnosky v. Bislow*, 251 Minn. 496, 498–99, 88 N.W.2d 847, 850 (1958) (legislative intent considered in construing statute which does not define key terms). Minn.Stat. § 611.30 (1984) states:

> It is hereby declared to be the policy of this state that the constitutional rights of

persons handicapped in communication cannot be fully protected unless *qualified interpreters* are available to assist them in legal proceedings. It is the intent of sections 611.30 to 611.34 to provide a procedure for the appointment of interpreters to avoid injustice and to assist persons handicapped in communication in their own defense.

(Emphasis added.) The legislature intended violations of § 611.32 to constitute violations of constitutional rights.[4] Therefore, appellant's statement must not only be suppressed, but Globa may not testify to what appellant told him or use the statement to refresh his recollection of what appellant told him. *See State v. Beach,* 304 Minn. 302, 310–11, 231 N.W.2d 75, 80 (1975) (where statute bars admission into evidence of statement and no constitutional rights are involved, witness may testify to recollection of interview and refresh recollection using the statement because rule that fruit derived from use of evidence obtained in unconstitutional manner does not apply to mere statutory violations); *State v. Jensen,* 349 N.W.2d 317, 321–22 (Minn.Ct.App.1984) (evidence derived by exploiting a previous constitutional illegality inadmissible for any purpose).

The State cites in support of affirmance *State v. Vu,* 339 N.W.2d 892 (Minn.1983) and *State v. Morales,* 324 N.W.2d 374 (Minn.1982). The cases are not on point because compliance with Minn.Stat. §§ 611.32 and 611.33 were not at issue in either case.

## II.

### *Mistranslations*

Appellant claims that mistranslations and omissions in translation of his testimony denied him due process of law and his right to a fair trial.

Appellant's counsel, concerned about accurate translation, requested before trial that the court appoint Danelia Savino to translate appellant's testimony to the jury. Savino is familiar with the type of Spanish spoken by appellant (low education Cuban). The trial court denied this request, appointing Luis Borges instead.[5] The trial court permitted Savino to translate the trial proceedings to appellant. Both Borges and Savino were sworn as interpreters.

Borges learned Spanish growing up in Puerto Rico. He has been employed by the Hennepin County District Court since 1981 and has translated over 1,000 hearings, including many translations for Cubans.

Appellant has the burden of proving that the interpretation was inadequate. *State v. Montalvo,* 324 N.W.2d 650, 652 (Minn. 1982). To meet this burden, appellant produced the testimony of Savino at the hearing on his new trial motion. Savino was present at trial and had reviewed an audio tape of the trial. No trial transcript (in English) was available at this time.

A. *Omitted neck "squeeze" testimony.* Savino testified that the interpreter omitted appellant's testimony that as he stood still, Chapman came and grabbed his neck, squeezing it. The State did not dispute this testimony.

B. *Omitted "and use it on me" testimony.* Savino testified, without contradiction, that the interpreter omitted a portion of appellant's testimony. Testimony that appellant was scared Chapman "will come back toward me and take the gun away from," should have read, "will come back toward me and take the gun away from me and using it on me."

---

4. The precise dimensions of the constitutional right to interpretation are not clear, but the lack of interpretation can violate a defendant's right to effective assistance of counsel and the right of confrontation and cross-examination. *See e.g., State v. Rios,* 112 Ariz. 143, 539 P.2d 900 (1975). A defendant's inability to comprehend *Miranda* warnings can render any purported waiver of *Miranda* rights unknowing and unintelligent.

5. This is not a case like *State v. Sauer,* 217 Minn. 591, 595, 15 N.W.2d 17, 20 (1944), where the defendant made no objection to appointment of the interpreter or to the interpreter's continuing to act.

C. *"Causionarlo".* Savino testified that appellant used "causionarlo" in describing his intent in drawing his gun during the initial dispute with Froiland. Borges translated it as "I want to coerce him." At the post-trial hearing, Borges testified that the word only has a meaning in context, and that it means "to advise him some event." Savino testified that the word means "to caution somebody." Thus, appellant produced evidence that "causionarlo" means one thing and the State responded with Borge's testimony that it means a second thing. Yet a third meaning was given at trial.

D. *"Embestir/Imbestir".* Appellant used "imbestir" in describing his confrontation with Chapman after the first shot and before the second, fatal, shot. Borges and Savino agreed that there is no such word as "imbestir" in Spanish, and that "embestir" is a Spanish word with a very similar pronunciation. Savino testified that "embestir"

> is usually associated when a bull is going to charge, whether it was the human or the bull fighter. It can also be used when two humans go at each other.
> Q. Is it accurate translation of that word, translator, that word as charging bull or something?
> A. I would do that, and I did it.

Borges agreed that "embestir" refers to male animals attacking each other, and can refer to male animals fighting for control of a herd. Borges translated appellant's testimony as "He came to tackle me." Post-trial, Borges did not testify that "tackle" is an accurate translation. What he said was that he "used tackle instead of embestir" because he thought that the meaning of animal fighting was inappropriate. Savino and Borges agree about the meaning of "embestir." However, Borges took it upon himself to paraphrase.

E. *Omitted "charging" testimony* Savino did testify, without contradiction, that in describing Chapman's actions between the two shots, appellant testified that "Chapman came with his head bent like this, like a charge, with his head bent down," and that this was never translated to the jury.

In support of his claim that Borges mistranslated "imbestir" and generally did not translate literally and accurately, appellant produced the affidavit of Patricia Nevins. Nevins stated that Borges told her he did not translate "imbestir" as "to charge like a bull" because he did not feel that appellant intended to convey that meaning. Borges disputed the context of this statement, but never really rebutted Nevins' statement that Borges, at other times, translated by paraphrasing because he did not believe that appellant meant to use the words he used.

The trial court denied appellant's motion for a new trial finding that the translation as a whole was accurate. We might agree that the alleged errors in translation do not in isolation warrant a new trial, were it not for other trial errors, as discussed in parts I, III, and IV of this opinion. The State argues that the translation discrepancies, if any, were either cured at trial or were harmless and thus, in neither case, justify a new trial. The State claims that the bull-charging idea was conveyed to the jury by appellant's gestures at trial. The omitted "use it on me" testimony was given to the jury later, on redirect.

We find that the translation problems are significant because they occur during testimony about what happened immediately before the two shots were fired. The alleged mistranslations occurred during crucial testimony about appellant's claims that Chapman's shooting death was accidental but that the assault on Froiland was in self-defense. In addition, the trial court itself admonished the interpreter for paraphrasing and giving obviously incomplete translations by telling Borges, "It appears that you may be summarizing from time to time."

 We hold that whether or not the translation errors by themselves amount to reversible error, they contribute to the cumulative effect of errors which denied appellant his right to a fair trial. *See State v.*

*Caldwell,* 322 N.W.2d 574, 592 (Minn.1982) (appellant did not receive a fair trial because the jury heard false testimony of a highly incriminating nature); *State v. Underwood,* 281 N.W.2d 337, 344 (Minn.1979) (cumulative effect of errs required reversal).

### III.

*Jury Instruction*

Appellant claims that the trial court erred by not instructing the jury on self-defense where death does not result based on CRIMJIG 7.06. Appellant was charged with assaulting Froiland, as well as with killing of Chapman. The trial court did instruct the jury on self-defense where death results based on 10 *Minnesota Practice,* CRIMJIG II, 7.05 (1985).

Generally, "a refusal to give a requested jury instruction lies within the discretion of the trial court." *State v. Daniels,* 361 N.W.2d 819, 831 (Minn.1985). Because "[t]he trial judge is in the best position to decide what instructions are necessary to the jury's decision, * * * his discretion must be respected." *State v. Link,* 289 N.W.2d 102, 107 (1979). However, at times the jury instructions given warrant reversal by an appellate court.

■ "It is beyond dispute that a party is entitled to an instruction on his theory of the case if there is evidence to support it." *State v. Ruud,* 259 N.W.2d 567, 578 (Minn. 1977) *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). Appellant requested the CRIMJIG 7.06 instruction based on his theory of self-defense to the second degree assault charge (upon Froiland). Respondent contends that the trial court's refusal to give the requested instruction was not error because appellant had not met his burden of producing evidence of self-defense. However, the facts and the instructions actually given by the trial court show there was sufficient evidence rationally to support a claim of self-defense on the charge of second degree assault against Froiland.

The trial court must have found that evidence of Chapman's actions sufficed to support a claim of self-defense. That is why CRIMJIG 7.05, on self-defense where death results, was given. However, testimony indicated that Froiland played a more aggressive role in the confrontation than did Chapman. He was abusive and angry, cursed appellant and shoved his hands in appellant's face. Therefore, testimony supported a jury instruction based on CRIMJIG 7.06.[6] In deciding appellant's guilt as related to the charge of assaulting Froiland, the jury may have been confused because the only self-defense instructions given involved death, but appellant did not kill Froiland. The jury may have decided that Froiland's actions toward appellant did not justify Chapman's death, and thus may have missed the point of whether appellant used legitimate self-defense short of death against Froiland.

The trial court may have misunderstood to what charge appellant actually claimed self-defense. Appellant asserted that the death of Chapman was accidental, but claimed that he assaulted Froiland in self-defense. Appellant did not assert self-defense to Chapman's killing. The lack of self-defense instruction involving self-defense short of death prejudices appellant as to the charge against him of assaulting Froiland.

We do not now mandate either CRIMJIG 7.05 or CRIMJIG 7.06, or both, at the new trial because conceivably the oral testimony and other evidence at the second trial could be different from that at the first. The trial court needs to base the jury instructions only on evidence actually presented at the second trial. We simply note that the trial court should carefully instruct the jury based on the evidence

---

6. We note that the substance of the requested instruction was not contained in the instructions given. In *State v. Edwards,* 343 N.W.2d 269, 277 (Minn.1984) the supreme court stated that CRIMJIG 7.05 was intended for situations in which death was intended, but that "when a defendant claims that he pointed a gun in self-defense but the shooting was accidental, CRIMJIG 7.05 clearly does not fit."

presented at the new trial, should carefully note defendant's different claims of defense, and should determine whether they are supported by the evidence. *See Ruud,* 259 N.W.2d at 578.

It is just as important to instruct properly on the second degree assault charge involving Froiland as it is involving the assault on Chapman because either could be the underlying felony for the felony murder charge.

## IV.

### *Lesser included offense*

The appellant contends that the trial court erred in not instructing the jury on the lesser included offense of second degree manslaughter.

■ "There is no question that third-degree murder, first-degree manslaughter, and second-degree manslaughter are all lesser-included offenses of first-degree murder." *Bellcourt v. State,* 390 N.W.2d 269, 273 (Minn.1986). *See also State v. Galvan,* 374 N.W.2d 269, 271 (Minn.1985) *cert. denied,* —— U.S. ——, 106 S.Ct. 1496, 89 L.Ed.2d 897 (1986); *State v. Leinweber,* 303 Minn. 414, 421, 228 N.W.2d 120, 125 (1975). Second degree manslaughter is also a lesser included offense of felony murder. In *Galvan,* 374 N.W.2d at 271, the supreme court found first degree manslaughter to be a lesser included offense of felony murder. *Galvan* cited *Leinweber,* 303 Minn. at 421, 228 N.W.2d at 125 which makes it clear that any lesser degree of homicide should be submitted if the facts justify submission. "Therefore, the only question this court must address is whether, * * * the evidence would reasonably support a conviction on the lesser degree and an acquittal on the greater offense." *Bellcourt,* 390 N.W.2d at 274 (relying on *Leinweber,* 303 Minn. at 422, 228 N.W.2d at 125–126).

"The determination of which, if any, lesser offenses should be submitted to the jury lies within the trial court's discretion, but when the evidence warrants such an instruction, it must be given." *State v. Werman,* 388 N.W.2d 748, 750 (Minn.Ct.App. 1986) (relying on *State v. Murphy,* 380 N.W.2d 766, 772 (Minn.1986)). *See also Bellcourt,* 390 N.W.2d at 273 ("The failure to give an appropriate instruction on lesser offenses is a ground for reversal only if defendant is prejudiced thereby").

■ The evidence could support appellant's acquittal of felony murder. First, the jury found the appellant not guilty of the intentional killing of Chapman. Second, the trial court must have felt that there was sufficient evidence to rationally support an acquittal of appellant on the grounds of self-defense, or it would not have submitted a jury instruction on self-defense. As outlined above, the evidence could have supported an acquittal of appellant on the second degree assault charge, which could, in turn, bring an acquittal of the second degree murder (felony murder) charge if the jury found that appellant's action toward Froiland was in self defense and whatever appellant did toward Chapman was accidental.

The evidence could support the conviction of appellant on the charge of second degree manslaughter. "Second-degree manslaughter is committed when one causes the death of another 'by his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another * * *.' Minn.Stat. § 609.-205, subd. 1 (1984)." *Werman,* 388 N.W.2d at 750. Culpable negligence "is more than ordinary negligence. It is gross negligence coupled with the element of recklessness. It is intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *State v. Beilke,* 267 Minn. 526, 527, 127 N.W.2d 516, 521 (1964). Taking a handgun into a bar, especially when intoxicated and intending to drink more, and initially getting the gun, not because of a need to defend oneself at the moment of peril, but because of an "anticipated fear", could support a verdict of guilty of second degree manslaughter.

In addition to leaving a place of safe haven and returning to a place where trouble could reasonably be anticipated, appellant brought a loaded gun into a crowded bar and then drew it while being harassed by two intoxicated men. A jury could have found all these facts sufficient to support a conviction of second degree manslaughter.

Appellant was prejudiced by the court's failure to instruct on the lesser included offense of second degree manslaughter, particularly as the evidence and appellant's theory of the case warranted an additional self-defense instruction. *See State v. Lee,* 282 N.W.2d 896, 899–900 (Minn.1979).

Absent an instruction on the lesser included offense, there was the danger that the jury would convict of the greater offense without being convinced beyond a reasonable doubt that appellant was guilty of the greater offense. The jury may have brought back the murder conviction because it felt a wrong had been committed which needed some punishment, even though they might have found that the facts better fit the lesser included offenses had it been given.

## V

*Sentencing*

Appellant claims that the trial court made two errors in sentencing. First, appellant claims that the trial court erred in departing durationally on the felony murder sentence. The trial court based its departure on particular cruelty to the victim, stating:

> The second shot put into Mr. Chapman's head while he was lying on the floor shows some cruelty beyond the norms that we can accept.

Appellant argues that this reason for departure ignores the jury's acquittal of appellant of intentional second degree murder. *See State v. Kisch,* 346 N.W.2d 130, 132 (Minn.1984); *State v. Givens,* 332 N.W.2d 187, 190 (Minn.1983). We do not specifically address the issue of departure because it may not arise again after the second trial. There could be an acquittal

on the homicide charges or a conviction based on different facts than presented by this record. However, should the same issue arise on the same facts, the court's reasoning, namely the second shot, appears to fall short of previous cases discussing gratuitous cruelty. This was a death resulting from the interplay in a bar of three intoxicated men, all sharing some responsibility. The record discloses nothing outside the norm of what is encompassed by the definition of felony murder in the second degree. We do not see any substantial and compelling circumstances for an upward departure.

The second sentencing issue raised is whether the trial court erred in sentencing appellant consecutively on the assault count. The sentence may be a double punishment. We address this issue because it involves jury instructions which can be cured on remand.

The trial court instructed the jury that the predicate felony for the felony murder could be second degree assault on either Chapman or Froiland. The jury's verdict did not indicate on which assault they based the felony-murder verdict. The jury also separately found appellant guilty of second degree assault on Froiland.

A defendant cannot be convicted and sentenced for both felony-murder and the predicate felony because the felony is "necessarily proved if the felony murder charge is proved." Minn.Stat. § 609.04 (1984); *State v. Fratzke,* 354 N.W.2d 402, 410 (Minn.1984). The jury might have found that the predicate felony was the assault on Chapman, thereby raising the possibility of punishment for both felony murder and the predicate felony on the same victim arising out of the same behavioral incident. *See* Minn.Stat. § 609.035 (1984). In order to avoid the possibility of appellant's being sentenced twice for the same underlying conduct, the trial court must, on remand, design the jury's verdict form so that the jury specifies the predicate felony upon which any felony murder conviction is based.

## DECISION

The cumulative errors of admitting appellant's statement as interpreted by Globa, mistranslations and omissions in translation at trial, and the refusal to give appropriate instructions on the lesser included offense of second degree manslaughter require reversal and remand for a new trial. On remand the trial court must submit a verdict form to the jury requiring the jury to specify which predicate felony is the basis for any felony murder conviction.

Reversed and remanded.