## STATE v. PHILIP PAUL MALZAC.

244 N. W. 2d 258.

July 9, 1976—No. 45728.

*C. Paul Jones*, State Public Defender, and *Gregory A. Gaut*, Assistant State Public Defender, for appellant.

*Warren Spannaus*, Attorney General, *Keith M. Brownell*, County Attorney, and *William D. Sommerness* and *Gregory K. Larson*, Assistant County Attorneys, for respondent.

Heard before Kelly, Todd, and Breunig, JJ., and considered and decided by the court en banc.

ROBERT J. BREUNIG, JUSTICE.*

Appeal from a judgment of conviction of murder in the second degree[1] and from an order denying defendant's motion for a new trial.

Defendant, Philip Paul Malzac, was charged with second-degree murder after the girl with whom he was living, Mary Sue Brown, died of a .20-gauge shotgun wound in the upper part of her left buttock. She was shot about 12:30 a. m. on February 7, 1974. The victim was in the back seat of her 2-door 1967 Plymouth Barracuda when the shooting occurred. Defendant was the only other person present at the time.

About 3 p. m. on the afternoon of February 6, 1974, Malzac took Mary Brown to work at the Holiday Inn, Duluth. There he became involved in an argument with the manager over Mary's hours. He wanted Mary to quit and leave with him; she refused. He left when the manager threatened to call the police.

From the Holiday Inn, Malzac went to a bar and had a beer. Then he went to Mary's apartment, where he was living. He picked up some personal belongings and told the older of her two

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

[1] Minn. St. 609.19 provides in pertinent part: "Whoever causes the death of a human being with intent to effect the death of such person or another, but without premeditation, is guilty of murder in the second degree * * *."

children [2] that he was moving out. From the apartment, Malzac went to two more bars. He had quite a bit to drink. About 6:30 p. m. he went to the home of his brother-in-law, Harry Schmidt, where he obtained permission to stay for the night and left his personal belongings.

From Schmidt's, he went to the home of a friend, Carl Markus. Markus was storing Malzac's three guns, and when Malzac left about 9:30 p. m. he took his .20-gauge, double-barrel shotgun and four shells. He went to two more bars, and at the second one he got into an argument with the bartender, Donald Putnam. According to Putnam's testimony, Malzac threatened to kill him, said he was going out to get the gun from the car, and left. The car was gone (Mary had picked it up after work). Malzac returned to the bar and called Schmidt for a ride home. Schmidt came, and the two drove to the home of Mr. and Mrs. Alfred Taylor, Mary's parents. Mary had arrived there with the car shortly after midnight.

Schmidt and Malzac arrived about 20 minutes later. Malzac went into the house, and an argument broke out over whether Mary was going to quit her job. Mrs. Taylor went to the phone to call the police. Malzac pushed her away and ripped the phone off the wall. Malzac then announced that he had something outside in the car that would take care of all of them. He upset some dishes on the table and went out and got his .20-gauge shotgun. Schmidt went home. When Malzac came back into the house, he renewed his demand that Mary quit her job and he also demanded that she come with him. He threatened to kill the whole family and shot the gun once into the ceiling. Mary then agreed to go with him. They left about 12:30 a. m. The homicide followed.

Malzac testified at trial in his own defense. He said that when Mary and he left the Taylor house they continued arguing as they drove away in the Barracuda. He said he ordered her into the

---

[2] Mary Brown's first marriage ended in divorce. Malzac had also been previously married and divorced.

back seat because he was afraid he would slap her. While still driving, he threw the gun into the back seat, and it discharged.

After the homicide, Malzac showed up at Schmidt's house. He said, "I think I killed her," and Schmidt told him to call a doctor if she was hurt. Malzac left and drove to the emergency room at St. Mary's Hospital. A nurse came out and Malzac held her at gunpoint. He told her not to call the police and to fix Mary up or he would be back. The nurse dragged Mary out of the car and Malzac sped away. This occurred about 1 a. m.

Malzac then went to the Twins Bar. He told the bartender that he just shot his girlfriend. Malzac held the bar patrons at gunpoint, yanked two bar phones off the wall, and fired two shots. Shortly after that he was subdued and taken into custody.

Defendant challenges the validity of his conviction on two grounds:

(1) Failure of the trial court, after timely request by defense counsel, to instruct the jury on the lesser and included offenses of murder in the third degree and manslaughter in the second degree; and

(2) Violation of defendant's Fifth Amendment privilege against self-incrimination and of rules of discovery in that the defense was forced to disclose the report of an expert witness it had hired and the video-tape deposition of that expert was admitted into evidence at trial over defense objection.

I

The leading Minnesota cases on the issue of whether the jury should be instructed on lesser and included offenses are State v. Jordan, 272 Minn. 84, 136 N. W. 2d 601 (1965), and State v. Leinweber, 303 Minn. 414, 228 N. W. 2d 120 (1975).

In Jordan, this court held that there are five principles which apply with respect to the submission of included crimes for consideration by a jury. Principles (b) and (c) from that opinion are relevant here:

"(b) If a defendant is guilty as charged, or not at all, in-

structions with respect to lesser but included crimes are not appropriate.

"(c) If the evidence adduced at trial would permit a finding of guilty of an included crime, defendant is entitled to appropriate instructions advising the jury of its power to return a verdict of guilty of the lesser offense." 272 Minn. 86, 136 N. W. 2d 604.

In Leinweber, this court wrote:

"The difficult problem confronting a trial court of when instructions on lesser degrees of homicide should be given * * * is often not easy to resolve. * * *

           *    *    *    *    *

"* * * [I]n a murder case it is preeminently the trial court's duty in the exercise of its discretion to determine what lesser degrees of homicide to submit. * * * In determining what, if any, lesser degrees should be submitted, the test should be whether the evidence would reasonably support a conviction of the lesser degree and at the same time is such that a finding of not guilty of the greater offense would be justified. Where such is the state of the evidence, it is the duty of the trial court to submit such lesser degrees as it determines the evidence warrants in order that the jury may properly carry out its deliberations contemplated by §§ 611.02 and 631.14. It follows that in such cases, unless waived by defendant, it is error not to submit lesser degrees except in those extraordinary cases where the failure to do so is otherwise supported by a proper exercise of the trial court's discretion and no prejudice to defendant results." 303 Minn. 419, 228 N. W. 2d 124.

Defendant argues that principle (c) from Jordan and the logic of Leinweber require reversal of his conviction. Defendant has two main contentions: First, that the circumstances under which Mary left the Taylor house that night provide sufficient evidence of kidnapping to justify an instruction on third-degree

murder (felony-murder).[3] Second, that the evidence additionally or alternately justified a lesser-included-offense instruction on the crime of criminally negligent homicide (manslaughter in the second degree).[4]

We reject both contentions. While it is true that Mary did not leave the Taylor house until Malzac had threatened the whole family and shot once into the ceiling, she did leave of her own accord. Moreover, Malzac and Mary expressed their love for each other as they left the Taylor home. They had had arguments before (Malzac had "moved out" on her several times previously), yet they always made up and got back together, even after occasions when defendant had broken furniture in Mary's apartment and beaten her severely. Thus, in spite of Malzac's threatening manner and the tension of the encounter that night at the Taylor house, he was no more violent toward Mary prior to the homicide than he had been on previous occasions. There was testimony at trial that they had gone for a car ride together at Mary's request immediately after an earlier fight in which he broke her collar bone. The pattern of their relationship suggests that she went with him willingly on the night in question.

As for defendant's contention that a second-degree manslaughter instuction ought to have been given, the test is "whether the evidence would reasonably support a conviction of the lesser degree and at the same time is such that a finding

---

[3] Minn. St. 609.195 reads in pertinent part: "Whoever, without intent to effect the death of any person, causes the death of another by either of the following means, is guilty of murder in the third degree * * *:

* * * * *

"(2) Commits or attempts to commit a felony upon or affecting the person whose death was caused or another * * *."

[4] Minn. St. 609.205 reads in pertinent part: "Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree * * *:

"(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another * * *."

of not guilty of the greater offense would be justified." State v. Leinweber, 303 Minn. 414, 422, 228 N. W. 2d 120, 125. Here defendant took the stand and testified that the gun accidentally went off when he threw it into the back seat. In addition, a police officer who helped take Malzac into custody testified that Malzac told him that the killing was an accident and that Mary was the only one he did not want killed. But the balance of the evidence in the case points the other way. Expert witnesses called by the state testified that the muzzle of the gun was 3 to 4 feet away from the victim when she was hit. There was expert testimony that the shot could not have come from the passenger side of the car or from between the car's front bucket seats. An expert testified that the source of the blood came from a point 27 inches from the driver's side of the car in the rear seat. Yet the gun itself was 43 inches long. Blood was found on the rear side panel of the car adjacent to the door panel on the driver's side, but no blood was found on the driver's door panel, even though the two abut. Nor was any blood found on the back of the driver's seat, even though blood was found on the floor carpeting behind the driver's seat. These facts support the inference that the shot must have been fired when the door on the driver's side was open and the driver's seat pushed forward.

The fact that no blood was found on the gun when there was blood on just about everything else in the back seat also makes defendant's story suspect. The Barracuda is a compact car, and this one had a head rest extending up from the passenger's front seat, which would have made throwing a 43-inch long shotgun into the back seat while driving rather awkward, to say the least. In sum, the physical configurations of the car do not leave room for the "accidental" homicide described by Malzac.[5]

Murder in the second degree is an intentional crime. Intent

---

[5] Thus, even if Mary Brown was kidnapped, a third-degree murder instruction would not have been appropriate, for the facts seem to establish an *intentional* homicide and third-degree murder is an unintentional homicide. See, footnote 3, *supra*.

was satisfactorily established here. There was testimony that Malzac threatened "to kill that bitch" when he found out that Mary had taken the car from the bar that night. He threatened to kill her whole family. He admitted that he was very angry with her when they got into the car together at the Taylor house. He held the nurse at the hospital and patrons of the Twins Bar at gunpoint. He told a police officer who knew him, "I killed her; it's murder one; I am guilty and I know it."

With respect to defendant's intoxication, the testimony indicates that Malzac had been drinking and was under the influence of alcohol, but was not drunk. His blood alcohol level, as measured shortly after he was taken into custody, was .19. There was, however, testimony by a toxicologist that an experienced drinker like Malzac (he admitted being a heavy drinker) with a .19 blood alcohol reading could well comprehend where he was going and what he wanted to do.

The facts of this case bring it within principle (b) of State v. Jordan, 272 Minn. 84, 86, 136 N. W. 2d 601, 610, and within the language of State v. Leinweber, *supra*. Neither State v. Swanson, 307 Minn. 412, 240 N. W. 2d 822 (1976); nor People v. Jones, 395 Mich. 379, 236 N. W. 2d 461 (1975); nor People v. Chamblis, 395 Mich. 408, 236 N. W. 2d 473 (1975); changes this result.[6] The trial court in Swanson gave a second-degree manslaughter instruction over defense objection that the defendant had intended to shoot the victim and that defendant was either guilty of first-degree manslaughter or innocent by reason of self-defense. The "objective" facts in Swanson suggested intent to kill in a context of provocation. The second-degree manslaughter

---

[6] The cited Michigan cases indicate, like State v. Leinweber, 303 Minn. 414, 228 N. W. 2d 120 (1975), that a lesser-included-offense instruction ought to be given if the evidence presented would support conviction of the lesser offense. People v. Jones, 395 Mich. 379, 389, 236 N. W. 2d 461, 465 (1975); People v. Chamblis, 395 Mich. 408, 421, 236 N. W. 2d 473, 480 (1975). Where the evidence does not support conviction on the lesser offense(s), such instructions need not be given.

instruction was upheld largely because this court felt that the jury could have believed defendant's testimony when he said he shot intending only to stop the victim and that hitting the victim four times from close range in the torso rather than in an extremity meant that the defendant had consciously taken the risk of causing the victim's death in a way that added up to culpable negligence as required for second-degree manslaughter.

Arguably, Swanson could be read to support the proposition that a second-degree manslaughter instruction ought to have been given here because defendant took the stand and said that the homicide was an accident. But to so read Swanson goes too far. In that case Swanson's testimony established that the shooting incident could have occurred as described by him. Unimpeached expert testimony in this case established that the shooting incident could not have happened as related by Malzac. We therefore hold that the trial court exercised good judgment in refusing to give jury instructions on the lesser and included crimes of murder in the third degree and manslaughter in the second degree.

## II

Defendant contends that the forced disclosure of a ballistics report of a defense-hired expert and the subsequent admission into evidence of a video-tape deposition of the same expert violated the attorney's work-product privilege, ran counter to the spirit of Rule 9.02, subd. 1(2), Rules of Criminal Procedure, and were in derogation of defendant's Fifth Amendment privilege against self-incrimination. We do not find these arguments persuasive.

The record makes it clear that disclosure of the defense expert's ballistics report came about through a process of willing compromise and negotiation. While it is true that Rule 9.02, subd. 1(2), does not *require* disclosure of such reports unless the defense plans to introduce the report into evidence, this rule has no application in a case where the defense voluntarily discloses

the report.[7] Defendant's work-product-privilege argument[8] fails for the same reason. By agreeing to disclose the report, the defense waived any work-product-privilege claim that it might have asserted.

Defendant's claim that his Fifth Amendment privilege against self-incrimination was violated when the state sought and the court permitted introduction into evidence of a video-tape deposition of the defense ballistics expert also fails. Section 3.2, A. B. A. Standards for Criminal Justice, Discovery and Procedure Before Trial (Approved Draft, 1970), indicates that such tests and reports, when disclosed, do not violate a defendant's Fifth Amendment privilege unless the material and information originate with the accused.[9] The gun which the expert used in this case was owned by defendant, but nothing in the expert's report originated with the defendant. The conviction of murder in the second degree is affirmed.

Affirmed.

---

[7] Moreover, Rule 9.02, subd. 1(2), Rules of Criminal Procedure, is technically inapplicable here because this case arose prior to July 1, 1975.

[8] See, Rule 9.02, subd. 3, Rules of Criminal Procedure.

[9] Rule 9.02, Rules of Criminal Procedure, is based upon A. B. A. Standards for Criminal Justice, Discovery and Procedure Before Trial, (Approved Draft, 1970) §§ 3.1, 3.2, 3.3.