STATE of Minnesota,
Petitioner, Appellant,

v.

Luis Candalario MITJANS, Respondent.

No. C4–85–2319.

Supreme Court of Minnesota.

June 26, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for appellant.

William R. Kennedy, Hennepin Co. Public Defender, Phillip D. Bush, Asst. Co. Public Defender, Minneapolis, for respondent.

COYNE, Justice.

We granted the state's petition for review in order to decide whether the court of appeals erred in granting a new trial to defendant, who was convicted by a district court jury of second-degree felony murder and assault with a dangerous weapon, Minn.Stat. §§ 609.19(2) and 609.222 (1986). The appeal raises issues relating to the use of interpreters in the interrogation and prosecution of criminal suspects, the adequacy of the trial court's instructions on self defense, the propriety of the trial court's refusal to submit culpably negligent manslaughter, and the legality of the sentence. Concluding that the court of appeals erred in its analysis of these issues and in awarding the defendant a new trial, we reverse its decision and reinstate the judgment of conviction, including the sentences imposed.

Defendant, age 38 at the time of trial in 1985, is one of the Cuban "boat people" who came to the United States in 1980. On February 27, 1985, defendant was in Casey's Bar in south Minneapolis with another Cuban, "Pelancho," and two women, Deanna Dionne and Jeanne Goodthunder, when he became involved in a dispute with two men who were sitting at the bar, Mike Chapman and Mark Froiland. Defendant killed Chapman and Froiland committed suicide before trial, so we do not have their versions of what happened. State's witnesses at trial included James Houston, the bartender; Greg and Mark Howell, two brothers who were regular customers; and Dionne and Goodthunder. Their testimony supports the following version of what happened.

Defendant and his companions arrived at the bar early in the evening. Defendant left by himself and went to his nearby residence, where he injected himself with cocaine and armed himself with his long-barreled .38 caliber revolver, then returned. Chapman and Froiland arrived at the bar shortly before 11:00 p.m. Defendant accused Froiland of making some sort of comment about Dionne. Froiland denied it and brushed defendant off when defendant got too close to him. Defendant then backed up a couple steps, pulled out his revolver, returned to the bar area and pushed the gun into Froiland's back and then neck and said, "You want to be tough, I show you tough." "Pelancho" tried to calm defendant down but defendant pushed him into Froiland; Froiland and "Pelancho," each grabbing the other, sort of "danced" toward the gameroom. When defendant started following them, Chapman lunged at defendant and tried to get the gun from him. Defendant shot Chapman in the abdomen during a struggle for the gun. Chapman fell to the floor; defendant, still standing, fired the gun into the back of Chapman's head from a distance of several feet, then fled with his companions. Dr. Garry Peterson, the pathologist, testified that the first bullet was the one to the abdomen, that it stunned Chapman's spinal column and would have caused his feet to go out from under him and temporarily prevented him from moving; he testified that the second shot was "at the back of [Chapman's] head in a very downward position."

Defendant was arrested the following day. Officer Anatoli Globa, who speaks Spanish and is routinely used by the police department whenever the suspect is Spanish-speaking, first questioned defendant directly in Spanish. Globa testified that before he even gave defendant a *Miranda*

warning and began asking questions, defendant said, "I know I did it, I did it, I feel bad, my conscience has to say it." Globa then gave defendant a *Miranda* warning and questioned him directly in Spanish. Subsequently, in the second part of the interview, Globa acted as interpreter for a different officer and for defendant, interpreting the officer's questions to defendant and defendant's answers to the officer. The English questions and the translated English answers were transcribed in English by a police stenographer. Globa then read this transcribed written statement to defendant in Spanish and defendant signed the statement. In the statement, which follows defendant's statement in Spanish when Globa was speaking to him directly rather than as an interpreter, defendant was interpreted as saying that he thought he got the gun from his residence because of an argument caused by "the man" calling him a "shitty nigger"; that he pulled out the gun after he was grabbed by the man; that he thought only one shot was fired; that the man "did offend me, but not enough to shoot him"; that he did not remember if he felt his life was being threatened; and "I feel I am responsible and my conscience feels bad."

At trial defendant's testimony was interpreted by a court-appointed interpreter, Luis R. Borges. Defendant was interpreted as testifying that Froiland called him a "mother fucker" and a "nigger"; that Froiland put his hands in defendant's face; that defendant stepped back and pulled the gun in order to "coerce" Froiland and stop the problems; that he did not point the gun at Froiland's head or neck; that Froiland walked toward the gameroom, fighting with "Pelancho"; that Chapman grabbed defendant by the neck; that there was a struggle and that the gun accidently fired once; that Chapman fell and then got up and tried to tackle defendant; that another shot was accidently fired; that defendant and the others then left, not knowing Chapman had been shot; and, finally, that defendant did not say all the things Globa testified he said.

The trial court submitted an assault count with respect to Froiland and intentional murder and felony murder counts with respect to Chapman. The jury acquitted defendant of intentional murder but found him guilty of felony murder and of the assault. The trial court sentenced defendant to 150 months for the murder of Chapman (an upward durational departure from the presumptive sentence of 105 months) and, pursuant to Minnesota Sentencing Guidelines and Commentary II.F.2 (1986), to a permissive consecutive sentence of 36 months for the assault of Froiland.

1. The court of appeals ruled first that the trial court erred in admitting defendant's statement to the police because Officer Globa did not take an oath when he questioned defendant; it ruled further that the error was prejudicial, at least when considered in connection with other errors. *State v. Mitjans,* 394 N.W.2d 221, 225–26 (Minn.App.1986).

The statutory provisions relied on by the court of appeals are Minn.Stat. §§ 611.30 to 611.34 (1986), which provide in relevant part:

**611.30 RIGHT TO INTERPRETER, STATE POLICY.**

It is hereby declared to be the policy of this state that the constitutional rights of persons handicapped in communication cannot be fully protected unless qualified interpreters are available to assist them in legal proceedings. It is the intent of sections 611.30 to 611.34 to provide a procedure for the appointment of interpreters to avoid injustice and to assist persons handicapped in communication in their own defense.

**611.31 HANDICAPPED PERSON.**

For the purposes of sections 611.30 to 611.34, "person handicapped in communication" means a person who: (a) because of a hearing, speech or other communication disorder, or (b) because of difficulty in speaking or comprehending the English language, cannot fully understand the proceedings or any charges made against the person, or is incapable of

presenting or assisting in the presentation of a defense.

## 611.32 PROCEEDINGS WHERE INTERPRETER APPOINTED.

Subdivision 1. **Proceedings and preliminary proceedings involving possible criminal sanctions or confinement.** In any proceeding in which a person handicapped in communication may be subjected to confinement or criminal sanction, or in any proceeding preliminary to that proceeding, including coroner's inquest, grand jury proceedings, and proceedings relating to mental health commitments, the presiding judicial officer shall appoint a qualified interpreter to assist the person handicapped in communication and any witness handicapped in communication throughout the proceedings.

Subd. 2. **Proceedings at time of apprehension or arrest.** Following the apprehension or arrest of a person handicapped in communication for an alleged violation of a criminal law, the arresting officer, sheriff or other law enforcement official shall immediately make necessary contacts to obtain a qualified interpreter and shall obtain an interpreter at the earliest possible time at the place of detention. A law enforcement officer shall, with the assistance of the interpreter, explain to the person handicapped in communication, all charges filed against the person, and all procedures relating to the person's detainment and release. The interpreter shall also assist the person with all other communications, including communications relating to needed medical attention. Prior to interrogating or taking the statement of the person handicapped in communication, the arresting officer, sheriff, or other law enforcement official shall make available to the person a qualified interpreter to assist the person throughout the interrogation or taking of a statement.

## 611.33 QUALIFIED INTERPRETER.

Subdivision 1. No person shall be appointed as a qualified interpreter pursu-

ant to sections 611.30 to 611.34 unless said person is readily able to communicate with the handicapped person, translate the proceedings for the handicapped person, and accurately repeat and translate the statements of the handicapped person to the officials before whom the proceeding is taking place.

Subd. 2. Every qualified interpreter appointed pursuant to the provisions of sections 611.30 to 611.34, before entering upon duties as such, shall take an oath, to make to the best of the interpreter's skill and judgment a true interpretation to handicapped person being examined of all the proceedings, in a language which said person understands, and to repeat the statements, in the English language, of said person to the court or other officials before whom the proceeding is taking place.

Subd. 3. The fees and expenses of a qualified interpreter shall be fixed and ordered paid by the presiding official before whom the proceeding is taking place out of the general revenue fund of the county in which the proceeding occurs.

Subd. 4. An interpreter pursuant to sections 611.30 to 611.34 shall not, without the consent of the person handicapped in communication, be allowed to disclose any privileged communication made by the person or any privileged information gathered from the person which was communicated or gathered during the time of service as an interpreter.

The court of appeals concluded that Officer Globa's failure to take an oath at the time he questioned defendant violated the statute; the court also stated that the police department should have obtained an independent interpreter and not have used Globa. The court concluded that the failure of Officer Globa to take an oath meant that the trial court should have suppressed all of defendant's statements. The court of appeals reasoned that the legislature intended any violation of the statute to be deemed a violation of the defendant's con-

stitutional rights and that, therefore, the trial court not only should have suppressed defendant's statements but should have barred their use in any way, even for impeachment. 394 N.W.2d at 225–26.

We believe that to the extent the statute deals with the interrogation of a criminal suspect, it presupposes an interrogating officer who is fluent only in English and a suspect who either is not fluent in English or is in some other way handicapped in communication. In other words, it presupposes a typical situation in which there is a need for the officer's questions to be interpreted by a third party to the suspect and for the suspect's responses to be interpreted by a third party to the officer. As we read the statute, the legislature contemplated that in such a situation the police should obtain a qualified independent interpreter before questioning the suspect and the interpreter should take an oath to translate accurately before the interrogation commences. The obvious purpose of the oath requirement in such a situation is to impress upon the interpreter that he is legally obliged to interpret fairly and accurately.

■ The interrogation in this case occurred in two parts. The first part consisted of a bilingual police officer, Officer Globa,[1] questioning the defendant directly in Spanish. The second part consisted of the same officer serving as an interpreter for another officer and for defendant. We do not believe that the legislature intended the provisions of the statute to apply to the situation in which a bilingual police officer questions a suspect, either in the field or at the stationhouse, directly in the suspect's own language. In this case defendant was no more handicapped in understanding and in expressing himself to Officer Globa than an English-speaking suspect is in understanding and in expressing himself to an English-speaking officer. In such a situa-

tion if the officer says something that the suspect does not understand, the suspect can clarify the matter with the officer in his own language, and if the suspect says something that the officer does not understand, the officer can ask the suspect in his own language to clarify the matter. It is not until the officer testifies in English at trial that translation becomes necessary and that translation, which occurs while the officer is under oath and subject to cross-examination, differs only in degree from the kind of translation or interpretation that commonly occurs when a typical Minnesota police officer, while testifying under oath, paraphrases the extrajudicial oral statements of a defendant who was raised in, for example, Brooklyn.

The purpose of the provision relating to interrogation is not to create an unreasonable road-block to the interrogation of a suspect who is handicapped in English but to insure that such a suspect will be treated as fairly as one who speaks English fluently. Accordingly, we find no fault with Officer Globa's interrogation of defendant directly in Spanish.

■ On the other hand, we do not believe the legislature contemplated that a bilingual police officer should serve as an interpreter, as Officer Globa did during the second part of the interrogation. This part of the interrogation presented what we earlier referred to as the "typical" situation presupposed by the legislature—the situation in which there is a need for the officer's questions to be translated by a third party to the suspect and for the suspect's responses to be translated by a third party to the officer. In such a situation the statute requires the police to obtain a qualified interpreter "to assist [the defendant] throughout the interrogation or taking of a statement." Minn.Stat. § 611.32, subd. 2. However qualified he or she is to act as an interpreter, a police officer is not the sort

---

1. Globa, a 14½-year veteran of the Minneapolis Police Department, is fluent in Ukranian and Spanish, as well as in English. As a child he lived 10 years in Argentina, speaking Ukranian at home and Spanish outside of the home. During his years as a police officer he has been asked on numerous occasions to translate from Spanish into English and vice versa.

of independent interpreter the legislature intended would assist the suspect throughout the interrogation.[2]

■ Although it appears that the police violated the statute in using Officer Globa as an interpreter, it does not follow that the trial court should have suppressed the statements defendant made during this part of the interrogation. Whether the trial court in this particular case erred in admitting the statements obtained from defendant is not an issue of statutory interpretation but a quintessentially judicial issue. As we have made clear in other contexts, "we have the primary responsibility under the separation of powers doctrine for the regulation of evidentiary matters," *State v. Burns*, 394 N.W.2d 495, 498 (Minn. 1986), and this includes the issue of the admissibility in criminal trials of evidence obtained in violation of statutes. There is no need for us to decide a hypothetical issue—whether we would, as a matter of comity, enforce a legislatively-created rule automatically excluding statements obtained in direct violation of sections 611.- 30–.34. Suffice it to say, the legislature did not express or imply any intent that statements obtained in violation of the statute automatically should be excluded in subsequent criminal proceedings and we do not judicially adopt such a rule. We reject the contention that the legislature in effect created a new constitutional right and that failure to comply with the statute amounts to a violation of that constitutional right, requiring exclusion under the exclusionary rule applicable to statements obtained in violation of the constitution. 394 N.W.2d at 226. While the legislature is free to enact statutes aimed at protecting or facilitating the exercise of constitutional rights,

the legislature cannot create constitutional rights by statute. *Wass v. Anderson*, 312 Minn. 394, 252 N.W.2d 131 (1977). It seems clear to us from the expression of policy in section 611.30 that the legislature enacted the provisions in question not with any mistaken impression that it was creating a new constitutional right but simply with the intent of protecting or facilitating the exercise of existing constitutional rights.

Defendant's statements to the police in this case fall into three different categories for purposes of admissibility analysis:

■ First, the statements made by defendant to Officer Globa in response to Globa's questions in Spanish were clearly admissible. Officer Globa was present in court, under oath and subject to cross-examination by defense counsel. His testimony was therefore admissible under Minn.R. Evid. 801(d)(2) (admission by a party opponent).

Second, the statements made by defendant to another officer with Officer Globa serving as an interpreter were also admissible under rule 801(d)(2) since Officer Globa was present in court, under oath and subject to cross-examination by defense counsel. If Officer Globa had not been present and if the statements had been offered through the other officer, then we would have a difficult hearsay issue to resolve. The issue would be a hearsay issue because the other officer, who speaks only English, could testify only to what Officer Globa said defendant had said. Some courts have reasoned that the interpreter normally may be viewed as an agent of the defendant and that therefore the translation is attributable to the defendant as his own admission and is admissible under rule 801(d)(2). 6

---

**2.** This is not to say that we have any reason to doubt the fairness or accuracy of Officer Globa's interpretation. As we indicated in n. 1, Officer Globa is qualified as an interpreter. Further, although he did not take an oath to interpret fairly before serving as an interpreter when the other officer questioned defendant, he presumably had taken an oath as a police officer and knew at the time of the interrogation that he

had a legal and ethical duty to translate fairly and accurately.

We also do not mean to suggest that the role of an independent interpreter is akin to that of an attorney. The independent interpreter's role in this context is simply to assist the suspect in communicating with the police, not to personally advise the suspect as an attorney would do.

Wigmore, *Evidence* § 1810 n. 2 (Chadbourn Rev. 1976); *In Re Olson's Estate*, 176 Minn. 360, 223 N.W. 677 (1929). We express no opinion on this issue but point out that under the agency theory of admissibility the case for admission of the defendant's statements in a criminal prosecution is certainly stronger if the interpreter on whose interpretation the witness relies is the defendant's own interpreter or an independent interpreter appointed to assist the defendant rather than one employed as a police officer.

The third type of statement involved in this case is the transcription of the English questions and the Spanish answers as translated into English by Officer Globa. Globa read the transcribed written statement to defendant in Spanish and defendant signed the statement. This statement was admissible on the same theory that Officer Globa's testimony of the statements made by defendant to the other officer were admitted since Globa was present, under oath and subject to cross-examination. We express no opinion on the admissibility of the signed statement absent the testimony of Officer Globa but note that the fact that defendant signed the statement by itself is not necessarily of any real significance because defendant himself was unable to read the statement he signed.

■ In conclusion, we are satisfied that the trial court properly admitted all of the evidence in this case. However, it should be obvious to any prudent police investigator from what we have said that if Officer Globa had not been available to testify, then the state's case for admissibilty of the oral and written statements would have been, at the least, weaker. The police could have or should have done three things to insure the subsequent admissibility of defendant's statements: they should have complied with the requirements of the statute relating to the appointment of an independent interpreter; they could have tape-recorded the interrogation of defendant, thereby making an accurate record of what was said; and they could have reduced the ultimate statement to writing in the defendant's own language, thereby enabling defendant to determine for himself what he was signing. In the future, prudent police investigators who wish to reduce substantially the risk of subsequent suppression of statements taken from suspects with language handicaps are advised to comply with the statutory requirements and to consider seriously the use of either or both of the two other techniques.

■ 2. The court of appeals next ruled that there were significant errors in the court-appointed interpreter's interpretation of defendant's trial testimony and that these errors contributed to the accumulation of errors requiring the granting of a new trial. 394 N.W.2d at 226–28.

The trial court appointed Luis R. Borges to translate defendant's trial testimony and appointed a defense-retained interpreter, Danelia Savino, to interpret the trial proceedings to defendant.[3] At the hearing on the motion for a new trial, defendant presented testimony from Savino in support of his contention that Borges had mistranslated and omitted parts of his testimony during the trial. Borges also testified. The trial court concluded that "the translation was on the whole adequate and accurate." We agree with this conclusion.

One of defendant's specific allegations was that Borges inaccurately translated defendants' testimony as to why he initially pulled the gun. According to Borges' translation, defendant testified that after Froiland called him names and put his hands in defendant's face, defendant stepped back and pulled the gun in order to "coerce" Froiland and stop the problems. Borges translated the word *"causionarlo"* as "to coerce." Savino testified at the

___

3. Borges has extensive experience as a court-appointed interpreter of trial testimony and, according to his testimony at the hearing on the motion for a new trial, has been "working with Cubans for a long time" and is familiar with their speech patterns and usages. Savino, who has spoken Spanish her entire life, also is familiar with the Cubans' speech patterns and usages.

hearing on the motion for a new trial that the word *"causionarlo"* really means "to caution." Borges, however, testified that the word means "to advise" or "to coerce" and that he used the phrase "to coerce" to convey the meaning he thought that defendant intended. We are not persuaded that Borges' use of the word "coerce" rather than "caution" had any conceivable effect on the outcome of the prosecution.

Another of defendant's allegations relates to the translation of defendant's testimony relating to the events immediately preceding the firing of the first shot. According to Borges' interpretation, defendant testified that after Froiland walked toward the gameroom fighting with "Pelancho," Chapman "grabbed" defendant by the neck, there was a struggle and the gun accidently discharged. Savino testified at the hearing that Borges should have interpreted defendant as saying that Chapman "squeezed" defendant's neck. As the trial court noted, it was clear from the interpretation that defendant testified that he "was in the grips of Mr. Chapman with his hands at [defendant's] gun and at his neck." In other words, the essence of defendant's testimony was adequately conveyed to the jury.

A third and final example of defendant's several allegations of incorrect translation relates to Borges' translation of the events immediately preceding the firing of the second shot. According to Borges' interpretation, defendant testified that after the first shot was fired, Chapman fell, then got up and tried to "tackle" defendant. At the hearing Borges testified that defendant said *"imbestir,"* which is not a word in Spanish. He testified that he assumed defendant meant *"embestir"* and that he translated it as "to tackle." He testified that he also could have said "to attack." Savino testified that what defendant meant was that Chapman "came at him like a charging bull." Again, we are not persuaded that the distinction affected the outcome, particularly since defendant not only physically demonstrated what Chapman did

by bending his head and stretching his hand out but also testified on redirect that "he was bent down coming towards me."

■ As has been stated elsewhere, "[n]o matter how skilled the translator is, he cannot rip language out of the speech community that uses it. Translation obviously is not a single two-way street between two languages. Rather, it is a busy intersection at which at least five thoroughfares meet—the two languages with all their eccentricities, the cultures of the two speech communities, and the speech situation in which the statement was uttered." P. Farb, *Word Play—What Happens When People Talk* 199 (1974). Translation is an art more than a science, and there is no such thing as a perfect translation of a defendant's testimony. Indeed, in every case there will be room for disagreement among expert translators over some aspects of the translation. Defense counsel, with the assistance of the defendant's own interpreter, is always free to object contemporaneously if counsel believes that the court-appointed interpreter has significantly misinterpreted or omitted parts of the defendant's testimony. Counsel also has the option of asking the defendant, during direct or redirect, to add to, explain or clarify his answers. The trial court, for its part, should understand the difficulties involved and should allow the translator adequate time to translate accurately, even if it involves taking a "time out" to consult with the defendant's interpreter in the presence of counsel in order to, as Mr. Borges puts it in his amicus brief, "share ideas for an accurate translation of the regional, idiomatic expression" used by the defendant. In this case, we are satisfied, as was the trial court, that Borges' translation of defendant's testimony was "on the whole adequate and accurate."

■ 3. The court of appeals also ruled that the trial court erred in its instructions on self-defense. 394 N.W.2d at 228–29. Defendant claimed that any assault on Froiland was in self-defense and that the

killing of Chapman was an accident that occurred while defendant reasonably defended himself against Chapman. Defense counsel wanted the general instruction on self-defense, 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIG 7.06, not the one that the trial court gave, CRIMJIG 7.05, which is the one for self-defense resulting in death. Our decision in *State v. Sanders*, 376 N.W.2d 196, 201 (Minn.1985), adequately discusses the need for analytic precision in instructions on self-defense. We are satisfied that the jurors understood from the instruction given that they should acquit defendant of assaulting Froiland if they concluded that he acted justifiably and that they should acquit defendant of the homicide charge if they concluded that defendant acted justifiably and that the killing was accidental. However, our reading of the transcript reveals that under our cases defendant was not even entitled to have self-defense submitted because it is clear from his own testimony that he did not act reasonably in self-defense. His own testimony establishes that he escalated the incident to a life-threatening level by unreasonably pulling the gun and that anything that happened thereafter was traceable directly to his own unreasonable act. Any intervention by Chapman after defendant unreasonably drew the gun was justified because Chapman, who was unarmed, was entitled to keep defendant from pursuing Froiland, who was also unarmed, with the gun.

4. The court of appeals ruled further that it was prejudicial error to refuse to submit culpably negligent manslaughter, Minn.Stat. § 609.205(1) (1986). 394 N.W.2d at 229-30. Our opinion in *State v. Edwards*, 343 N.W.2d 269, 274-76 (Minn. 1984), discusses in detail the cases bearing on the submission of the lesser offense of culpably negligent manslaughter. This case is similar to *State v. Malzac*, 309 Minn. 300, 244 N.W.2d 258 (1976), one of the cases we discussed in *Edwards*. Here, as in *Malzac*, there was unimpeached expert medical testimony that was inconsist-

ent with the defendant's version of the events and that precluded the jury from rationally acquitting defendant of the charged offense of felony murder and at the same time convicting him of culpably negligent manslaughter. The expert testimony makes it clear that the second shot was not the result of an accident but was assaultive in nature. The lack of any evidence that defendant acted reasonably in self-defense also supports the trial courts' refusal to submit the lesser offense.

5. Finally, the court of appeals concluded that (a) the departure from the presumptive sentence duration for felony murder (150 months instead of 105 months) was unjustified and (b) there "may" be a problem of double jeopardy in that the trial court imposed a permissive consecutive sentence of 36 months for the assault of Froiland. 394 N.W.2d at 230.

(a) The court of appeals concluded that the trial court ignored the verdict of acquittal of intentional murder and based the departure on its conclusion that defendant intentionally killed the victim. 394 N.W.2d at 230. The court of appeals concluded further that this was a typical felony murder. *Id.*

In view of the jury's verdict acquitting defendant of intentional murder, "we must assume that the killing was an unintentional killing in the course of an assault with a dangerous weapon and we must determine if it was somehow more serious than the 'typical' killing in the course of a felony." *State v. Kisch*, 346 N.W.2d 130, 132-33 (Minn.1984). As we stated in *State v. Back*, 341 N.W.2d 273, 276-77 (Minn. 1983), "[i]f there is such a thing as a typical felony murder, it probably is an unintentional killing that occurs in the course of robbery or some other crime against the person." By definition, felony murder involves an unintentional killing resulting from the commission of a crime against the person or from the commission of some other felony that, as committed, involves some special danger to human life. *State v. Nunn*, 297 N.W.2d 752 (Minn.1980). Fel-

ony murders which we have deemed to be sufficiently atypical to justify upward departures include *State v. Kisch*, 346 N.W.2d at 133 (defendant and two friends, all 17, killed 12-year-old runaway, administering at least four blows to his skull with a board, causing his skull to "explode"; upward departure was justified because killing was "not just an unintentional killing resulting from a single blow but one resulting from multiple brutal blows" administered by defendant and the others on a victim who depended on them for help); *State v. Back*, 341 N.W.2d at 277 (defendant and two friends went on late-night shooting spree that lasted a significant period of time and involved firing 30 shots with high-powered rifle at a number of buildings, including 4 to 5 shots into the house of the victim, who was killed by one of the bullets; invasion of the victim's curtilage, randomness of killing and total innocence of victim all bore on determination that defendant committed the offense of felony murder in a particularly serious way); *State v. Kindem*, 338 N.W.2d 9, 17–18 (Minn.1983) *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) (defendant, who was "mastermind" of robbery, and his brother hit elderly victim on head with a baseball bat three times in course of robbing him in backyard of his house as he returned late at night with receipts from business; upward departure was justified because of intense amount of planning by defendant as to when victim would be most vulnerable and because robbery involved invasion of victim's zone of privacy).

■■■■ We believe that the facts of this case sufficiently distinguish this case from the typical felony murder. Even if defendant did not intend to kill Chapman, he engaged in a course of conduct that involved a particularly grave danger to human life, firing not one but two shots in a public bar, the latter shot when Chapman apparently was in a particularly vulnerable position on the floor. And, as the record demonstrates, these shots put a number of people at risk and in fear. Under all the circumstances, we conclude that the departure was justified. *See*, in addition to the cases already cited, *State v. Winchell*, 363 N.W.2d 747, 750 (Minn.1985) (upholding upward departure in robbery case in part because three people were put in fear); *State v. Norton*, 328 N.W.2d 142, 147 (Minn.1982) (upholding upward departure in case involving kidnapping of 5–year-old girl from front yard in part because of emotional distress caused by defendant to the victim's family); *State v. Profit*, 323 N.W.2d 34, 36 (Minn.1982) (upholding upward departure where defendant intentionally committed violent crime in front of children); *State v. McClay*, 310 N.W.2d 683, 685 (Minn.1981) (upholding departure in aggravated robbery case because more people were put in fear than in usual case).

(b) In suggesting that there "may" be a problem of double punishment in the imposition of a permissive consecutive sentence of 36 months for the assault of Froiland, the court of appeals reasoned that the conviction of felony murder may have been based in part on the underlying assault of Froiland since both the assault of Froiland and the assault of Chapman were listed in the complaint as predicate felonies. 394 N.W.2d at 230.

■■■■ The Court of Appeals relied on Minn.Stat. § 609.04, subd. 1(4) (1986), which codifies the so-called *Blockburger* rule.[4] The *Blockburger* rule basically is that, absent legislative intent to the con-

4. Section 609.04, subd. 1 (1986) provides:
   Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be any of the following:
   (1) A lesser degree of the same crime; or
   (2) An attempt to commit the crime charged; or
   (3) An attempt to commit a lesser degree of the same crime; or
   (4) A crime necessarily proved if the crime charged were proved; or
   (5) A petty misdemeanor necessarily proved if the misdemeanor charge were proved.
   As we made clear in *State v. Jackson*, 363 N.W.2d 758, 760 (Minn.1985), section 609.04

trary, if one offense is necessarily included in another, then only a single conviction is allowed. *State v. Dudrey,* 330 N.W.2d 719, 721–22 (Minn.1983). *See Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), for a recent example of the United States Supreme Court's application of the rule. The rule does not prohibit conviction for two offenses if the greater offense is against one victim and the included offense is committed against a different victim. A multiple-victim exception is set out in both section 609.04 and section 609.035 (which generally prohibits imposition of more than one sentence when a defendant commits more than one offense as part of a single behavioral incident). *See State v. Hodges,* 386 N.W.2d 709 (Minn.1986). Even if the only predicate felony for the murder conviction was the assault of Froiland, the *Blockburger* rule does not apply. The ultimate crime for which defendant was convicted, felony murder, was the killing of Chapman. Thus, we are satisfied that there were separate crimes against two different people, the felony murder conviction for the murder of Chapman and the assault conviction for the assault of Froiland. Accordingly, under Minnesota Sentencing Guidelines and Commentary II.F.2 (1986) (as well as under the multiple-victim exception to Minn.Stat. § 609.035 (1986)), permissive consecutive sentencing was available as an option to the trial court.

Reversed and judgment of conviction reinstated.

gives broader protection to criminal defendants than that provided by the United States Supreme Court in its interpretations of the federal double jeopardy clause.