*This opinion is nonprecedential except as provided by
Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0771**

State of Minnesota,
Respondent,

vs.

Devin Matthew Weiland,
Appellant.

**Filed June 17, 2024
Affirmed
Smith, Tracy M., Judge**

Freeborn County District Court
File No. 24-CR-20-1674

Keith Ellison, Attorney General, Ed Stockmeyer, Assistant Attorney General, St. Paul, Minnesota; and

David Walker, Freeborn County Attorney, Albert Lea, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Bratvold, Presiding Judge; Connolly, Judge; and Smith, Tracy M., Judge.

**NONPRECEDENTIAL OPINION**

**SMITH, TRACY M.**, Judge

Appellant Devin Matthew Weiland challenges his convictions for attempted first-degree murder, arguing that the evidence was insufficient to prove the elements of intent and premeditation beyond a reasonable doubt. He also argues that the district court erred

by entering three convictions for second-degree assault with a dangerous weapon based on the same conduct as the attempted first-degree murder convictions. Weiland raises additional arguments in his pro se supplemental brief. We affirm.

**FACTS**

Following an eight-hour standoff with law enforcement during which Weiland shot a police officer and two civilians, respondent State of Minnesota charged Weiland with three counts of attempted first-degree murder, in violation of Minnesota Statutes section 609.185(a) (2020), and three counts of second-degree assault with a dangerous weapon, in violation of Minnesota Statutes section 609.222, subdivision 1 (2020). Weiland acknowledges that the facts surrounding the incident are largely undisputed. But he contests whether the evidence is sufficient to prove beyond a reasonable doubt that he intended to cause the death of the peace officer and acted with premeditation and intent to cause the death of the two civilians. He contends that the evidence showed that his intent was to commit "suicide by cop."

Weiland lived on the third floor of an eight-story apartment building in Albert Lea. On the evening of November 28, 2020, Weiland attended a party in another unit in the building. According to what Weiland later told the police, there was a conflict between Weiland and some attendees at the party and he returned to his apartment and took out his firearms "just in case anything did happen." Weiland then discharged one of his firearms inside his apartment.

At 2:17 a.m., Weiland called 911. He reported that he had heard "either a firecracker or a gunshot" near his apartment building and requested that an officer be dispatched "as

2

soon as possible." He later stated that he was concerned that the police would take his firearms away based on the discharge of his firearm inside his apartment.

Albert Lea Police Officer K.N. was immediately dispatched to the apartment building, arriving minutes later. In his marked squad car, Officer K.N. entered the building's horseshoe-shaped driveway, driving slowly with his windows down "to see if anything caught [his] eye." As he was about to leave the driveway and enter the parking lot, he heard several loud "explosions." He heard something hit his squad car and felt something "slam" into his chest. Realizing that he had been shot, Officer K.N. accelerated through the parking lot, exited the parking lot through a field, and drove himself to the hospital. Weiland had shot Officer K.N. on the right side of his chest; a bulletproof vest stopped the bullet from entering his body. Later investigation showed that Officer K.N.'s squad car was struck by gunfire several times.

Other police officers also responded to the original 911 dispatch. As they approached the apartment building, they heard semiautomatic gunfire. They did not immediately know where the gunfire was coming from. Once they realized that the shots were coming from the apartment building, the officers established a position behind a water pump house just northeast of the building. They continued to hear gunfire at random intervals. They heard gunfire hit the trees in front of the pump house and the pavement behind them.

D.T. lived on the same floor as Weiland and considered himself Weiland's friend. The night of the standoff, he went to bed around 1:00 a.m. He did not fall asleep because he heard what he thought were "fireworks" starting around 1:00 a.m. At about 2:30 a.m.,

3

he decided to go check on his vehicle in the parking lot and then smoke a cigarette. After seeing that his vehicle was undamaged, he headed east toward a bus shelter north of the apartment building. As he was walking, he heard a loud noise and fell to the ground. Realizing that he had been shot, D.T. got up and ran. He reached officers on the north side of the building, who helped him evacuate to the pump house. Weiland had shot him. The bullet entered the back of D.T.'s right arm, shattered his humerus bone, exited his arm, and grazed his chest. D.T. was brought to the hospital in Albert Lea and then flown by helicopter to Rochester for medical care.

P.F. lived across the street from the apartment building. On the day of the incident, he woke up at about 5:00 a.m. and left for work at about 5:30 a.m. As he was driving down the street, he heard a "loud bang" under his car and pulled to the side of the road. Weiland had shot P.F. The bullet had pierced the car and traveled through the left side of the back of P.F.'s knee into his calf. Four officers were able to get to P.F., and they carried him to an armored vehicle and transported him to the hospital. P.F. was then flown by helicopter to Rochester for medical care. He spent two-and-a-half to three months in intensive care.

Around 6:00 a.m., officers deployed a video surveillance drone to pinpoint the shooter's location in the apartment building. When the drone operator flew the drone close to the building, Weiland shot at the drone several times, eventually shooting it out of the air. During this time, officers determined that Weiland was shooting from his third-floor apartment.

4

SWAT teams worked to evacuate residents from the apartment building. When the building was mostly evacuated, officers took up positions inside the building, with approximately 25 to 30 officers on the ends of the third-floor hallway.

Around 8:45 a.m., a SWAT team used tear gas to try to force Weiland to leave his apartment. The team drove its armored vehicle in front of the building, and officers shot tear gas canisters, at least one of which entered Weiland's apartment. Weiland responded with gunfire toward the armored vehicle. One bullet struck its bulletproof windshield, directly in front of the driver's seat. Because of damage to the windshield, the vehicle had to retreat. Later investigation revealed that the vehicle had been hit by at least six rifle shots on the driver's side.

Immediately after shooting at the armored vehicle, Weiland fired his rifle at his apartment door. Bullets went through his door and across the hallway. No officers were struck. Weiland later told the interviewing investigator that, after the teargas came into his apartment, he thought that "an assault team" would be in the hallway.

A neighbor who had awakened to a popping sound watched events unfold throughout the standoff. He saw muzzle flashes from Weiland's gunfire and saw Weiland shoot both D.T. and P.F. He also saw the armored vehicle take gunfire. When asked whether he saw a pattern to Weiland's gunfire, he said that Weiland shot "[a]nything moving."

Three sniper teams were stationed across the street from the apartment building. Around 9:40 a.m., one of the snipers saw Weiland appear at a window and take aim out the window. The sniper fired a bullet that ricocheted off Weiland's windowsill and hit Weiland

5

in the forehead. Weiland, who had fired his rifle at nearly the same moment, did not know that he had been shot, instead thinking that a ricochet from his own gunshot had struck him.

Officers on the third floor were using a robot equipped with a speaker system to communicate with Weiland. Before he was shot, Weiland had been directed to surrender, but he did not. After he was shot, Weiland told officers that he was injured, and they responded that they could help him. Weiland eventually opened his apartment door and, as directed by officers, showed an empty hand, but he then retreated back into his apartment. In continued communications with officers, Weiland said that he was breaking down his weapons. At 10:48 a.m., Weiland finally surrendered—coming out of his apartment unarmed—and was taken into custody.

Weiland was transported to the hospital and treated for his injury. At the hospital, he claimed that he did not mean to shoot the police or P.F. He denied knowing that he had shot D.T. When informed that his own head injury was from a bullet, Weiland said, "Too bad it didn't kill me. I wish it would have." The next day, he gave a Mirandized[1] statement to an investigator from the Minnesota Bureau of Criminal Apprehension. He claimed that he did not intend to kill anyone but was instead trying to commit suicide by having the police shoot him.

The jury found Weiland guilty of all counts. The district court entered convictions for all counts and sentenced Weiland to three consecutive executed terms of 200 months

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (holding that, when a person is in custody and questioned, the person must be informed of their rights, including the right to remain silent and the right to an attorney).

each for the attempted first-degree murders. The district court imposed no sentences for the three assault convictions.

Weiland appeals.

**DECISION**

**I.    The circumstantial evidence is sufficient to prove intent and premeditation.**

Weiland argues that the state presented insufficient evidence of intent and premeditation because, he contends, the circumstances proved are consistent with a rational theory other than guilt. Weiland suggests that the circumstances proved are consistent with him trying to commit "suicide by cop," which he claims is inconsistent with him acting with premeditation and intending to cause the deaths of D.T., P.F, and Officer K.N.

Appellate courts apply a two-step analysis to review the sufficiency of circumstantial evidence. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). First, the court identifies the circumstances proved, deferring "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 598-99 (quotations omitted). In other words, in determining the circumstances proved, the court considers "only those circumstances that are consistent with the verdict." *Id.* at 599. Second, the court determines "whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, not simply whether the inferences that point to guilt are reasonable." *Id.* (quotations omitted). At this step, the court does not defer to the jury's choice between reasonable inferences. *Id.* "Circumstantial evidence must form a complete chain, that in view of the evidence as a whole, leads so directly to the guilt of the defendant

7

as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted).

Weiland was convicted of three counts of attempted first-degree murder. The statute criminalizing first-degree murder reads:

> (a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:
>> (1) causes the death of a human being with premeditation and with intent to effect the death of the person or of another; . . . [or]
>> (4) causes the death of a peace officer . . . with intent to effect the death of that person or another, while the person is engaged in the performance of official duties.

Minn. Stat. § 609.185(a)(1), (4); *see also* Minn. Stat. § 609.17, subd. 1 (2020) (stating that "[w]hoever, with intent to commit a crime, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime"). Because Officer K.N. is a peace officer, the state had to prove that Weiland intended to cause the death of Officer K.N. but did not have to prove premeditation. For Weiland's shootings of D.T. and P.F., the state had to prove both intent and premeditation. Intent and premeditation are usually proved with circumstantial evidence. *State v. Balandin*, 944 N.W.2d 204, 217 (Minn. 2020).

For first-degree murder, "'[w]ith intent to' . . . means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4) (2020). Intent can be inferred from the actor's words and actions before and after the incident, the nature of the victim's wounds, and the extent of the victim's wounds. *Balandin*, 944 N.W.2d at 216.

8

In the context of first-degree murder, "'premeditation' means to consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2020). It "requires some amount of time to pass between formation of the intent and the carrying out of the act." *Balandin*, 944 N.W.2d at 213 (quotation omitted). Where there is only circumstantial evidence, "premeditation may be inferred from planning activity, motive, the nature of the killing, and a defendant's actions following the killing." *Id.* (quotation omitted). Courts can consider the number of wounds, whether the wounds were inflicted on vital areas, and the passage of time between the infliction of wounds in determining whether the nature of the killing supports premeditation. *Id.* at 215.

### A. Officer K.N.

To prove attempted first-degree murder with respect to Officer K.N., the state had to prove that Weiland had the intent to cause Officer K.N.'s death.

Assuming that the jury believed all evidence that showed that Weiland had an intent to cause the death of Officer K.N. and disbelieved all inconsistent evidence, the circumstances proved are:

1. Weiland discharged a firearm into the ceiling of his apartment;

2. Weiland feared that the discharge of his firearm would cause law enforcement to confiscate his firearms;

3. Weiland called 911 and informed the dispatcher that he had heard fireworks or a gunshot outside;

4. Weiland requested that an officer be dispatched "as soon as possible";

5. Weiland stored his firearms unloaded;

6.      Weiland waited for Officer K.N.'s squad car to turn into the parking lot before firing at the squad car; and

7.      Weiland fired four shots that hit the exterior of the squad car and a fifth shot that passed through the vehicle's open window and hit the right side of Officer K.N.'s bulletproof vest, above his chest.

As Weiland concedes, the circumstances proved are consistent with the reasonable inference that Weiland had the intent to cause Officer K.N.'s death. Weiland feared losing his guns after discharging his weapon into the ceiling. He lured Officer K.N. to the apartment building by making a false report to the 911 dispatcher, took the time to load his firearm, waited until Officer K.N. had turned into the driveway to make his escape more difficult, and then aimed and fired five shots at Officer K.N.'s moving vehicle, including one that would have hit Officer K.N. in a critical area had he not been wearing a bulletproof vest.

Weiland contends, though, that the circumstances proved are also consistent with the rational hypothesis that he intended only to incite fear to provoke officers to shoot and kill him. We are not convinced.

First, the circumstances described above are inconsistent with an intent to cause mere fear.

Second, we are not persuaded that the circumstances proved support a reasonable inference that Weiland intended to be shot by the police. On the contrary, the circumstances proved suggest that he was trying to avoid that result. Weiland did not identify himself or his apartment number when he called 911, he interfered with law enforcement's ability to locate him as the shooter by keeping officers pinned down through gunfire and shooting

10

down a surveillance drone, he fired through his apartment door into the hallway when he believed officers would be trying to enter, and he twice opened his apartment door while unarmed, including when he finally surrendered. These actions are not consistent with the inference that he was seeking to be shot by police.

Third, even if the circumstances proved did lead to the rational inference that Weiland intended to be shot by police, that inference is not inconsistent with guilt. Under the circumstantial-evidence test, the defense's proposed inference must lead to a rational hypothesis "inconsistent with guilt," *State v. Harris*, 895 N.W.2d 592, 600 (Minn. 2017), or, stated differently, a "rational hypothesis of innocence," *State v. Hawes*, 801 N.W.2d 659, 669 (Minn. 2011). Weiland's proposed inference, that he intended to commit "suicide by cop," is not inconsistent with an intent to kill Officer K.N.—he could have intended to cause the death of Officer K.N. as part of a broader plan to be killed by the police. The "suicide by cop" inference regarding Officer K.N. therefore does not lead to a rational hypothesis of innocence. Accordingly, the circumstantial evidence is sufficient to show that Weiland intended to cause the death of Officer K.N.

**B.     D.T. and P.F.**

To prove attempted first-degree murder with respect to D.T. and P.F., the state had to prove that Weiland acted with both premeditation and the intent to cause their deaths. Along with the above circumstances, the state also proved:

1.     During the incident, Weiland shot at "anything moving";

2.     Weiland's ammunition clips held only ten bullets at a time;

11

3.  Around ten minutes passed between when Weiland shot Officer K.N. and when Weiland shot D.T.;

4.  Weiland fired at D.T. shortly after D.T. walked in front of the apartment building;

5.  Weiland shot D.T. through the upper arm, and the bullet grazed his chest;

6.  D.T. was airlifted to Rochester for medical care;

7.  Weiland shot P.F. about three hours after shooting D.T.;

8.  Weiland shot P.F. through the door of P.F.'s car while the car was moving;

9.  P.F. was shot in the leg;

10. P.F. was airlifted to Rochester for medical care, where he spent approximately two-and-a-half months in intensive care;

11. Weiland shot both D.T. and P.F. with his rifle, not a shotgun; and

12. Weiland later shot at the armored vehicle, striking the windshield directly in front of the driver's head.

As Weiland concedes, the circumstances proved are consistent with the reasonable inference that Weiland intended to cause the deaths of D.T. and P.F. and that Weiland acted with premeditation. As for intent, the circumstances proved show that Weiland shot D.T. at chest level—had his humerus not deflected the blow, D.T. likely would have died. Weiland carefully aimed at the driver's side door of P.F.'s moving vehicle to shoot him. Weiland used a rifle, not his shotgun, when firing at D.T. and P.F., who were both at a distance from him. Weiland made specific efforts to target people throughout the night, including shooting at the head of the driver of the armored vehicle. As for premeditation, the circumstances proved show that Weiland loaded his unloaded guns at the start of the incident; had time to consider his actions between shooting Officer K.N. and D.T. and

12

between shooting D.T. and P.F.; and, because his ammunition clip held only ten bullets, had to repeatedly decide to reload his firearm between every ten shots.

Weiland contends, though, that the circumstances proved are consistent with the rational hypothesis that he lacked intent and premeditation. He points to an absence of motive and planning before the incident, the fact that Weiland did not fire finishing shots at D.T. and P.F. after shooting them, and that he fired at them from a distance, not close range. He also argues that his actions and statements to law enforcement afterward suggest that he was trying to commit "suicide by cop." We are not persuaded. Weiland loaded and reloaded his rifle, took aim at D.T. and P.F. where he found them, and shot them in a manner that would not suggest merely trying to injure them. And, for the reasons described above with respect to Officer K.N., the circumstances proved do not lead to the rational inference that Weiland was trying to get shot by the police and, even if that was his intent, "suicide by cop" is not inconsistent with the intent to kill D.T. and P.F. The circumstantial evidence is sufficient to prove that Weiland acted with both intent and premeditation.

**II. The district court did not err by entering convictions for second-degree assault.**

Both Weiland and the state agree that the district court erred by entering the three convictions for second-degree assault because the assaults are lesser-included offenses of the attempted first-degree murders. Although the parties agree, we review the question because "it is the responsibility of appellate courts to decide cases in accordance with law." *State v. Hannuksela*, 452 N.W.2d 668, 673 n.7 (Minn. 1990).

A person "may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2020). Appellate courts review de novo whether

an offense is an included offense. *State v. Cox*, 820 N.W.2d 540, 552 (Minn. 2012). An included offense is, among other things, "a crime [that is] necessarily proved if the crime charged were proved." Minn. Stat. § 609.04, subd. 1(4). To determine whether an offense is necessarily proved by proof of another, the reviewing court looks at the elements of the offenses rather than the facts of the particular case. *State v. Roden*, 384 N.W.2d 456, 457 (Minn. 1986).

Second-degree assault with a dangerous weapon is not a lesser-included offense of attempted first-degree murder because, based on the elements of the statutes, one could commit the offense of attempted first-degree murder without committing the offense of second-degree assault. *State v. Whisonant*, 331 N.W.2d 766, 769 (Minn. 1983). We therefore conclude that the district court did not err by entering convictions for second-degree assault.

## III. Weiland's arguments in his supplemental brief lack merit.

### A. Void for Vagueness

Weiland argues that the first-degree murder and second-degree murder statutes are unconstitutionally vague because "there is no difference between the conduct the two statutes cover." Weiland asserts that "[t]he crimes of first-degree premeditated murder and second-degree intentional murder are thus void, as are all convictions and sentences under them."

Weiland did not make this argument to the district court, so it is not properly before us. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts generally will not consider matters not argued to and considered by the district court); *Roby*

14

*v. State*, 547 N.W.2d 354, 357 (Minn. 1996) (stating that appellate courts "generally will not decide issues which were not raised before the district court, including constitutional questions of criminal procedure"). In any event, the Minnesota Supreme Court has ruled that the statutes are not void for vagueness because there is a difference between intent and premeditation. *State v. Moore*, 846 N.W.2d 83, 87 n.1 (Minn. 2014).

B.      **Separation of Powers and Double Jeopardy**

Weiland argues that the district court violated the constitutional separation of powers and the bar on double jeopardy by imposing separate sentences for the attempted murder of each of his victims.

Under Minnesota Statutes section 609.035 (2020), a person generally cannot be sentenced for more than one offense arising out of the same behavioral incident. *State v. Bookwalter*, 541 N.W.2d 290, 293 (Minn. 1995). We need not review whether Weiland's offenses arose from the same behavioral incident because, even if they did, multiple sentences are permitted for offenses that have multiple victims. *See State v. Alger*, 941 N.W.2d 396, 400 (Minn. 2020). And the Minnesota Supreme Court has determined that the multiple-victim rule does not violate the separation of powers, *Munt v. State*, 920 N.W.2d 410, 419 (Minn. 2018), and does not violate the bar on double jeopardy, *State v. Mitjans*, 408 N.W.2d 824, 835 (Minn. 1987). We therefore conclude that the district court did not err by imposing three consecutive sentences for Weiland's attempted first-degree murder of Officer K.N., his attempted first-degree murder of D.T., and his attempted first-degree murder of P.F.

**Affirmed.**