**STATE of Minnesota, Respondent,**

v.

**Sergio SANCHEZ–DIAZ, Appellant.**

**No. A03–1342.**

Supreme Court of Minnesota.

July 29, 2004.

Lydia Villalva Lijo, Asst. State Public Defender, Minneapolis, for Appellant.

Mike Hatch, Attorney General, St. Paul, Michael K. Junge, McLeod County Atty., and Mark A. Metz, Asst. McLeod County Atty., Glencoe, for Respondent.

## OPINION

GILBERT, Justice.

In this appeal from a conviction for first-degree murder while committing domestic abuse and second-degree murder of an unborn child, appellant Sergio Sanchez–Diaz asks us to consider four issues. The first is whether the state introduced sufficient evidence to prove the elements of domestic abuse murder; namely, that appellant committed the murder while engaging in domestic abuse and that appellant engaged in a past pattern of domestic abuse. The second is whether the jury instruction defining a past pattern of do-

mestic abuse was erroneous. The third is whether the district court erred in admitting appellant's statements to police, which contained numerous interpretation errors. The final issue is whether the district court abused its discretion by imposing a consecutive sentence for the second-degree murder of an unborn child conviction.

Because of the nature of appellant's arguments, it is necessary to review the relevant facts in detail. On the night of December 29, 2001, appellant allegedly stabbed Laura Vazquez Ruelas 13 times, killing her and her unborn child. At the time, appellant was 23 years old and was living with the victim who was 26 years old. They had a 9–month–old son who was born in March of 2001. The victim was also 6 months pregnant with their second child.

The appellant and victim's intimate relationship began in 1999. They were both recent immigrants from Mexico. They lived together in a mobile home park in Lester Prairie. The victim's family occupied six mobile homes in the park. In December of 2001, the appellant and victim moved out of their mobile home, which lacked heat, and into lot 15 with one of the victim's sisters and her family.

On the night of the murder, the victim was at her parent's trailer with her son playing dominos with family members. Appellant was feeling sick and came to the trailer at around 8:30 p.m. to take their son home so he could go to sleep. Family members testified that appellant appeared angry when he arrived at the trailer and that he slammed the door on his way out. Appellant returned to the trailer about a half hour later, stuck his head in the door, and asked the victim to return home because the child was "crabby." The victim returned home shortly thereafter.

The victim's mother was concerned for her daughter's well being because appellant appeared upset when he arrived at the trailer. She asked two adult male relatives to check on her daughter and appellant. They refused, and she then asked her 13–year–old daughter (the victim's sister) to go to lot 15. About 5 to 10 minutes elapsed between the time the victim left the trailer and her 13–year–old sister left to check on her. Upon arriving at lot 15, the victim's sister heard the child crying and ran into the trailer. In the trailer, she observed the victim on the ground unconscious with her child who was physically unharmed next to her. She also saw appellant with a knife in his chest. Appellant told her not to say anything. She ran home, alerted her mother, and someone called 911.

Family members ran to lot 15 and at least five of them entered the trailer before the police arrived. Lester Prairie police officers arrived at the scene at about 9:30 p.m. The officers saw the victim and appellant lying on the floor covered in blood. The victim had a steak knife blade lodged in her upper right shoulder. One of the officers checked the victim's pulse and did not find a pulse. He then checked appellant's pulse, eventually felt a faint pulse and called for medical assistance. The officers recovered a wooden knife handle between two couches that matched the blade lodged in the victim. The blood on the knife blade lodged in the victim matched her DNA profile but not appellant's. The officers found a second bloody knife behind the faucet in the kitchen sink. The blade of that knife contained a mixture of DNA from two people, with the predominant DNA profile matching appellant, and the other profile could not be identified.

The victim was stabbed 13 times in her chest, face, and lower back. The most serious wound pierced her aorta. Her 6–month–old female fetus died as the result of a lack of oxygen circulation. The autop-

sy revealed that the fetus had no apparent congenital or developmental defects or any direct injuries from the stabbing.

Appellant was taken to the emergency room at Waconia Ridgeview Medical Center. He had five stab wounds, three to his upper chest on the left side and two to the middle of his left upper abdomen. One of the stab wounds collapsed a lung. The doctor who treated appellant in the emergency room and a forensic pathologist testified that they could not tell whether any of the wounds were self-inflicted.

The police took a brief statement from appellant in the emergency room at approximately 11:15 p.m. the night of the murder. An interpreter was called to the emergency room. At the time, the interpreter was not a state certified interpreter.[1] In that brief statement, appellant told police that he and the victim were arguing, he pushed her on to the bed; she stabbed him and then he took the knife from her and stabbed her.

A BCA agent and a detective took a second more detailed statement from appellant in the hospital two days later on December 31. Investigators utilized the same interpreter. In that statement, appellant said that he and the victim were arguing in the bathroom about the victim's desire to leave him. During that argument he slapped the victim in her face, took their son to the living room and began putting his jacket on in an attempt to leave. Appellant stated that the victim then stabbed him in the chest; he removed the knife from his chest, stabbed the victim, and then stabbed himself. In that statement, appellant also admitted to grabbing the victim by the neck on a prior occasion and to slapping the victim two or three times in the past. Appellant also

stated that the victim was afraid of him. Additionally, when questioned about what the victim's family members would tell investigators about the way appellant had treated the victim in the past, appellant said that members of the victim's family knew that he had abused the victim and that "[e]verybody knew how we lived."

On January 3, 2002, the state charged appellant with second-degree intentional murder and second-degree murder of an unborn child. On February 21, 2002, a grand jury indicted appellant for first-degree murder, second-degree murder, and second-degree murder of an unborn child. The trial was scheduled to begin on January 14, 2003. However, on that day, the two court-appointed interpreters who had reviewed the tapes and transcripts of the interviews indicated to the judge that "significant errors" were made in the translations from English to Spanish and from Spanish to English during the interviews. The court appointed an expert translator to listen to the tapes of the interviews and provide a new transcript. The translator spent a substantial amount of time listening to the tapes of the interviews and she prepared a new transcript detailing the original translation in one column and the corrected translation in the second column.

That transcript identified numerous translation errors from both interviews. Because of the nature of appellant's arguments, it is necessary to review some of the errors in detail. First, the interpreter made a number of relatively minor interpretation errors throughout both interviews. She consistently translated "stabbed" as "cut" and "argument" as "discussion." The interpreter also translated "crime scene team" as "team of felonies,"

---

**1.** At trial, that interpreter testified that since the time of the interviews she passed phase one of the two-phase court interpreter certification exam. She also testified that Spanish is her native language and that before the interviews she had interpreted in court proceedings in various counties.

"physical" as "palpable," and "scared" as "shocked."

The interpreter also made errors that are more significant. During the December 29 interview, investigators asked appellant how long he had lived in lot 22 before moving into lot 15. He answered "two months" and the response was translated as "two years." When asked how far along the victim was in her pregnancy, appellant responded that he did not know. That response was translated as "six months."[2] At another point in the interview, the investigator asked appellant where he stabbed the victim. The interpreter translated the question as "[w]here did you hit her." In the December 31 interview, after describing how the victim had stabbed him, appellant described what he did with the knife. He stated: "And I * * * removed it from myself. Because she got scared and jumped back." That response was translated as "[a]nd I took it away from her, because she got scared and she pushed—pulled back." Similarly, at another time in the interview appellant stated: "When she—when I took the knife out of myself in the living room." That response was translated as "[w]hen I pulled the knife out in the living room." When appellant was describing how he took their son and was about to leave the trailer he stated: "And when I was changing the baby, I was putting on his jacket so I could leave." That response was translated into English as "[a]nd I was putting a sweater on [the] baby." When appellant was explaining a previous incident where he had choked the victim, he admitted choking her and stated: "But it was a very serious fight." That response was translated as "[i]t was a fight that wasn't very serious." In explaining why the bloody knife recovered by the sink did not work when he attempted to commit suicide, appellant said, "[b]ecause it wasn't very big I

think." That response was translated as, "I think it's too big." When appellant explained why he had stabbed the victim, he stated: "I was mad that she had cut me. At the time I felt the cut, I—I didn't feel anything, I thought she'd hit me with her hand because I didn't turn." That response was translated as "I was angry that she had stabbed me. *From the moment I stabbed her,* at first, I thought that she had just hit me with her hand." (Emphasis added). Additionally, several times during the December 31 interview, the translator declined to translate expletives used by appellant.

Appellant moved to suppress the December 29 and 31 statements because of the numerous interpretation errors and because the *Miranda* warnings were not given verbatim. In a written order and accompanying memorandum, the court denied the motion as it related to the *Miranda* warnings because the warnings, while not verbatim, were sufficient. The court also denied the suppression motion with regard to the interpretation errors stating:

> This [c]ourt has carefully reviewed the transcripts and report made by the [c]ourt appointed expert interpreter. It is evident that at times errors in interpretation were made. However, examining the two statements in their entirety, this [c]ourt is satisfied that the live interpretation done when the statements were taken, sufficiently allowed the law enforcement officers and the defendant to understand what was being communicated back and forth. The quality and quantity of the errors in interpretation, as found by the [c]ourt appointed interpreter, do not rise to a level where admission of the statements would be unjust.

2. In the December 31 interview, appellant stated that the victim was 6–months pregnant.

However, credible evidence of specific errors in the interpretation made during the statements of the defendant, if offered by either party should be admitted and considered by the jury in determining the weight to give the statements or any particular answer of the defendant. Before such evidence is offered, this [c]ourt will confer further with counsel in regards to the form such evidence should take and the manner in which it should be presented to the jury.

The interpretation errors were still very much at issue during the trial. The state played the tapes of both interviews to the jury. Before the tapes were played, the court considered several motions from appellant. The motions included a motion to exclude some portions of the statements because of confusion and vagueness caused by the interpretation errors and a motion to redact portions of the tapes and transcripts. The court denied the motion to exclude portions of the statements because the court was satisfied that the jury would "hear plenty of interpretation evidence concerning this" and at some point see the transcript detailing the errors. The court further stated that it would let the jury decide "where there are discrepancies and what they believe should be considered to be accurate." The court agreed to redact portions of the tapes and transcripts. The court redacted the Miranda warnings, an admission appellant had used drugs in the past, and statements that appellant had prior traffic and alcohol-related arrests, and had been previously married.

The judge gave the jury only the original transcript that contained the errors when it listened to the tape of the December 29 interview. Appellant did not object to the admission of that transcript. Before listening to the tape of the December 29 interview, the judge instructed the jury on the purpose of the transcript. He stated:

An audio tape of a statement has been received into evidence. This tape is going to be played so that you can listen to it. You are also going to be provided with a written transcript of the statement to assist you as you listen to the tape. The evidence you are to consider is what you hear on the tape. If what you hear on the audio tape differs from what you read in the written transcript, then you should disregard that portion of the transcript and rely solely on what you hear on the tape.

The jury heard the tape of the December 31 interview the next day. At appellant's request, the jury was not given a cautionary instruction like the one it had been given when it heard the December 29 statement. Once again, without objection by appellant, the jury only received the original transcript of this interview.

The same day the jury heard the December 29 statement, the expert who listened to and identified the interpretation errors testified. The transcripts she produced were also admitted into evidence. She testified that she generally spent approximately an hour to an hour and one-half translating each minute of a recorded statement. She also testified that she had significant resources available to her to ensure that the translation was accurate. She testified that she has approximately 40 dictionaries and often consults colleagues who are experts in the field if necessary. Appellant's counsel also elicited testimony from her highlighting a number of the errors made during the original interpretation.

The interpretation errors were also very much at issue at closing arguments. Over the state's objection, the court allowed the jurors to have copies of the corrected transcript during closing arguments. The jurors also had both sets of transcripts when they deliberated. As part of its closing

argument, the state maintained that despite the errors in translation, the statements of appellant were credible and matched the physical evidence in the case. In its closing argument, the defense individually detailed over 40 perceived inaccuracies and omissions in the translation.

In addition to the interpretation errors, the other primary issue at trial was whether there was sufficient evidence to prove a past pattern of domestic abuse. The state proceeded on the theory that appellant had abused the victim in the past and committed this murder as a part of that pattern of abuse. The defense argued that the facts did not constitute first-degree domestic abuse murder because the victim verbally provoked appellant during the argument and physically provoked him by stabbing him.

To prove the past pattern of domestic abuse, the state introduced appellant's statements, the testimony of witnesses who observed appellant choking the victim, and testimony that appellant admitted to some of the victim's family members that he had abused her. The state also presented testimony concerning bruising around the victim's eye. The relevant statements of appellant that the state introduced to prove the past pattern of domestic abuse included appellant's admissions that he had choked the victim once and that he had slapped her two or three times before the night of murder. The state also relied on the fact that appellant had slapped the victim in the face the night of the murder, and his statement that "everybody knew how we lived." With regard to the choking incident, three young family members of the victim testified that they observed appellant choking the victim sometime after March of 2001. One of the family members who witnessed the choking incident also testified that after that incident she observed bruises on the victim's neck. The victim's aunt testified that appellant told her he had choked the victim during an argument. Similarly, her husband testified that sometime after March of 2001, appellant admitted to him that he had hit the victim. A number of the victim's family members also testified that sometime after March of 2001, they observed bruising under the victim's eye. None of these family members, however, knew whether appellant caused the bruising.

Ultimately, the jury found appellant guilty on all counts. The district court imposed a life sentence for the first-degree murder conviction and a consecutive sentence of 306 months for the second-degree murder of an unborn child conviction. This appeal followed.

## I.

■ We first consider appellant's argument that the evidence was insufficient to prove that he committed a murder while engaging in domestic abuse and that he had engaged in a past pattern of domestic abuse. "When reviewing a claim of insufficient evidence, this court's inquiry is limited to whether the fact finder could have reasonably concluded that defendant was guilty beyond a reasonable doubt. The court views the evidence in the light most favorable to the verdict and assumes that the fact finder believed the state's witnesses and disbelieved any contrary evidence." *State v. Welch*, 675 N.W.2d 615, 619 (Minn.2004) (internal citation omitted).

■ Minnesota Statutes § 609.185(a)(6) (2002) provides that whoever "causes the death of a human being *while committing domestic abuse*, when the perpetrator has engaged in a *past pattern of domestic abuse* upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life," is guilty of murder in the first degree. (Em-

phasis added.) Domestic abuse is defined as an act that

(1) constitutes a violation of section 609.221, 609.222, 609.223, 609.224, 609.2242, 609.342, 609.343, 609.344, 609.345, 609.713, or any similar laws of the United States or any other state; and

(2) is committed against the victim who is a family or household member.

Minn.Stat. § 609.185(c). Thus, in order to sustain a conviction for first-degree domestic abuse murder, the state must prove both a past pattern of domestic abuse and that appellant caused the victim's death while committing domestic abuse.

■■■■ The state has the burden of proving a past pattern of domestic abuse beyond a reasonable doubt, but it need not prove each act constituting that pattern beyond a reasonable doubt. *State v. Cross*, 577 N.W.2d 721, 727 (Minn.1998); *see also State v. Manley*, 664 N.W.2d 275, 282–83 (Minn.2003). Jurors "are not required to unanimously agree on which acts comprised the past pattern of domestic abuse." *State v. Crowsbreast*, 629 N.W.2d 433, 439 (Minn.2001). In the context of domestic abuse, a pattern "suggests a regular way of acting by committing acts of domestic abuse." *State v. Robinson*, 539 N.W.2d 231, 237 (Minn.1995). "The statute does not require proof of a pattern of domestic abuse *convictions*, or specify a minimum number of incidents which must be proven in order to find a 'pattern.'" *Cross*, 577 N.W.2d at 727. However, a lone act of domestic abuse cannot constitute a pattern. *State v. Grube*, 531 N.W.2d 484, 491 (Minn.1995).

Appellant argues that the evidence was insufficient to prove a past pattern of domestic abuse because the only credible evidence the state presented demonstrating abuse was that he put his hands around the victim's neck once. Appellant maintains that the testimony regarding the bruising under the victim's eyes is irrelevant because there is no evidence connecting the bruising to any actions by him. Appellant asserts that his statements are insufficient to establish a past pattern of domestic abuse because they lack details. The state argues that appellant's admissions to hitting and choking the victim and his statement that "everybody knew how we lived," considered with the testimony of family members who observed the choking incident and the bruising, is sufficient to prove a past pattern of domestic abuse.

In order to determine whether a reasonable jury could have found a past pattern of domestic abuse, it is necessary to carefully examine the evidence presented regarding the abuse and the nature of appellant and victim's relationship as a whole. It is uncontested that sometime after March of 2001, appellant committed an act of domestic abuse when he choked the victim. Three people witnessed the event, and appellant admitted it to police and at least one other individual. Appellant's own statement that he had slapped the victim on two or three occasions before the night of the murder is also compelling evidence of other incidents of domestic abuse. This statement is buttressed by the testimony of a family member of the victim who testified that appellant told him that he hit the victim sometime after March of 2001. However, the evidence of bruising on the victim's face cannot support the finding of a past pattern of abuse because there is no evidence that appellant caused the bruising.

Nevertheless, other statements of appellant and his actions on the night of the murder reveal that the choking and slapping were not "isolated" incidents but rather part of a "regular way of acting by committing acts of domestic abuse." *Robinson*, 539 N.W.2d at 237. Appellant's statement that "everybody knew how we

lived" in response to a line of questioning about whether other people in the mobile home park would tell authorities about other times he hit the victim is telling. That statement makes it clear that the abuse appellant admitted was part of the regular way in which he related to the victim. The meaning of the statement "everybody knew how we lived" is not ambiguous as appellant contends. The meaning is clear from the context of the questions that investigators asked. The jury could determine on this record that any remaining ambiguity was extinguished by appellant's statement immediately following his response that "everybody knew how we lived" where he admits that others knew he was abusing the victim. Another revealing statement appellant made concerning the nature of his relationship with the victim is that he thought that the victim was scared of him. Moreover, the fact that appellant slapped the victim in the face during the argument on the night of the murder cannot be ignored in considering the volatile and abusive nature of the relationship between appellant and victim.

Viewing the evidence in the light most favorable to the verdict, the combination of the factors described above was sufficient for a reasonable jury to find that appellant engaged in a past pattern of abuse toward the victim. We recognize that the facts of this case do not demonstrate a past pattern of abuse as clearly as the facts of our past decisions. *See, e.g., Manley,* 664 N.W.2d at 280–81; *Crowsbreast,* 629 N.W.2d at 435–36; *Grube,* 531 N.W.2d at 487–89. However, the choking and multiple slapping incidents, considered together with the evidence of the pervasive nature of the abuse in the relationship, are adequate to demonstrate a past pattern of abuse.

▮ The evidence is also sufficient for a reasonable jury to find that appellant caused the victim's death while committing domestic abuse. *See* Minn.Stat. § 609.185(a)(6). It is reasonable for a jury to find that a defendant caused the death of a victim while committing an act of domestic abuse, when during an argument the defendant slaps the victim, and ultimately stabs her 13 times. Therefore, we hold that sufficient evidence was introduced to satisfy the elements of domestic abuse murder as defined by Minn.Stat. § 609.185(a)(6).

## II.

▮ Appellant next argues that the jury instruction defining "past pattern of domestic abuse" was erroneous because it instructed the jury that no specific number of prior acts were required for it to conclude that there was a past pattern of domestic abuse. Appellant did not object to this instruction at trial. Nevertheless, this court will consider appellant's argument "if the instructions contain plain error affecting substantial rights or an error of fundamental law." *Cross,* 577 N.W.2d at 726. In order to satisfy the plain error test (1) there must be an error; (2) the error must be plain; and (3) the error must affect the defendant's substantial rights. *Crowsbreast,* 629 N.W.2d at 437 (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998)). If a defendant satisfies this three-prong test, we will only address the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal citations omitted).

The instruction here was not in error. In the instruction, the court defined past pattern of domestic abuse as

> prior *acts* of domestic abuse which form a reliable sample of observable traits or acts which characterize an individual's behavior. No specific number of prior *acts* is required.

In this case, in deciding whether there has been a past pattern of domestic abuse, you must only consider *acts* of the Defendant, if any, that occurred before December 29, 2001.

(Emphasis added). This instruction is substantially similar to the instruction the trial court gave in *Robinson*. 539 N.W.2d at 236. In *Robinson*, unlike here, the defense objected to the "no specific number of prior acts" language at trial. *Id.* We affirmed the defendant's conviction without commenting on the validity of this instruction. *See id.* at 236–38.

The sentence in the instruction that reads, "no specific number of prior acts is required" is troubling. The language is troubling because that sentence, considered alone, implies that a single act of domestic abuse is sufficient to constitute a pattern. However, the complete instruction and the context surrounding it, make it clear that the jury was instructed that more than one prior act of domestic abuse was required.[3] It is critical to bear in mind that the instruction is defining a "past *pattern* of domestic abuse." A pattern is " 'a regular, mainly unvarying way of acting or doing.' " *Robinson*, 539 N.W.2d at 237 (quoting *Webster's New World Dictionary* 1042 (2d ed.1980)). It is commonly understood that a pattern constitutes more than one act. Based on the language of the entire instruction, a jury could not come to the conclusion that a pattern means anything other than the commonly understood definition.[4] The instruction refers to "acts" in the plural three times, and is clear that the *acts* must have occurred before the date of the murder. The common meaning of the term

pattern and the court's use of the plural "acts" were sufficient to convey the message to the jury that more than one act was required in order to find a past pattern of domestic abuse. We therefore hold that the jury instruction was proper.[5]

Because the dissent neglects to consider the impact of the plain error test in its analysis, we note that even if the instruction was in error, the error was not plain. In *Crowsbreast*, the defendant challenged a jury instruction because it did not instruct the jury that the state needed to prove each prior act of domestic abuse beyond a reasonable doubt. 629 N.W.2d at 437. The same instruction had been challenged unsuccessfully in *Cross*. *Crowsbreast*, 629 N.W.2d at 437 (citing *Cross*, 577 N.W.2d at 726–27). However, after *Cross's* publication, a U.S. Supreme Court case cast some doubt on *Cross's* holding. *Crowsbreast*, 629 N.W.2d at 437–38 (citing *Richardson v. United States*, 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999)). We held that because of the holding in *Cross* that the state need not prove each act of domestic abuse beyond a reasonable doubt, if the instruction was in error, that error was not plain. *Crowsbreast*, 629 N.W.2d at 438. We noted that any doubt about whether *Cross* remained good law in light of the Supreme Court decision undermined Crowsbreast's plain error argument because the "doubt confirms that if there was error, it was not plain." *Crowsbreast*, 629 N.W.2d at 438. Similarly, the court here gave an instruction substantially similar to the instruction in *Robinson* where we affirmed the conviction without comment on the instruction.

---

**3.** Moreover, in its closing argument, the state reiterated that in order to find a past pattern of domestic abuse the jury had to find more than one prior incident of abuse.

**4.** The dissent takes the "no specific number of prior acts" language out of context, instead of

considering it in context with the entire instruction.

**5.** Because there is no model instruction for domestic abuse murder, we refer the matter of drafting a model instruction to the Criminal Jury Instructions Committee.

*See* 539 N.W.2d at 236. Thus, because we affirmed a conviction, which utilized a substantially similar instruction, and did not find error in that instruction, if there was an error in the instruction in this case, the error was not plain. *See Crowsbreast,* 629 N.W.2d at 438.

### III.

The next question we must decide is whether the trial court abused its discretion by admitting appellant's December 29 and 31 statements because the statements contained interpretation errors. "Rulings on evidentiary matters rest within the sound discretion of the trial court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion." *State v. Roman Nose,* 667 N.W.2d 386, 392 (Minn.2003). Defendants have a due process right to a fair trial and a defendant "is entitled to a new trial if the errors, when taken cumulatively, had the effect of denying [a defendant] a fair trial." *State v. Keeton,* 589 N.W.2d 85, 91 (Minn.1998). Specifically, in evaluating the translation of testimony, this court asks whether the "testimony was 'on the whole adequate and accurate.'" *State v. Mitjans,* 408 N.W.2d 824, 832 (Minn.1987). It is important to bear in mind that "[t]ranslation is an art more than a science, and there is no such thing as a perfect translation."[6] *Id.* A defendant bears the burden of proving that the translation was inadequate. *State v. Montalvo,* 324 N.W.2d 650, 652 (Minn. 1982).

An accused who does not speak English has the right to have a "qualified interpreter" present at an interrogation. Minn.Stat. § 611.32, subd. 2 (2002). This right is not a constitutional one and violation of the statute does not require the application of the exclusionary rule.

*Mitjans,* 408 N.W.2d at 830; *accord State v. Dominguez–Ramirez,* 563 N.W.2d 245, 253 (Minn.1997). Nonetheless, in order to ensure the admissibility of statements taken with an interpreter, prudent police investigators should comply with the statutory requirements and, additionally, either record the statement and/or reduce it to writing in the defendant's primary language. *Mitjans,* 408 N.W.2d at 831.

The issue here is not whether there were translation errors; it is whether in light of these errors admitting the statements deprived appellant of a fair trial. Appellant argues that four errors in the translation process, taken together, merit suppression of his statements. First, the interpreter was not certified; second, she did not take an oath before translating; third, the statements were not transcribed into Spanish for appellant to sign; and fourth, the statements included 47 identified errors. The state contends that, as a whole, the translations of appellant's statements were adequate and accurate and, therefore, the trial court did not abuse its discretion by admitting the statements.

Appellant's first three arguments for suppressing the statements are without merit. Minnesota Statutes § 611.32, subd. 2, does not require that an interpreter translating during an interrogation be certified. The statute only requires that the interpreter be qualified. *See id.* In *Dominguez–Ramirez,* we declined to suppress a defendant's statement when the interpreter was arguably "not sufficiently fluent to * * * meet the statutory requirements for a qualified interpreter" and the interpreter admitted that his Spanish pronunciation "[was] not as good as others" and that "there are Spanish words he does not understand." 563 N.W.2d at 253–54.

---

6. Indeed, no translation can be expected to be error free. "[I]n every case there will be room for disagreement among expert translators over some aspects of the translation." *Mitjans,* 408 N.W.2d at 832.

Here, the interpreter is a native Spanish speaker who had previously translated in court proceedings in several counties. She is more qualified then the interpreter in *Dominguez–Ramirez* and the fact that she was not certified does not merit suppression of appellant's statements.

Similarly, the failure of the interpreter to take an oath does not merit suppression. Minnesota Statutes § 611.33, subd. 2, requires that interpreters take an oath before translating. However, in *Dominguez–Ramirez*, the police officer who acted as an interpreter violated section 611.33, subdivision 2, by not taking an oath, and we declined to suppress the defendant's statement. *Dominguez–Ramirez*, 563 N.W.2d at 253. We also decline to suppress appellant's statement on this basis.

The state's failure to transcribe appellant's statements into Spanish is not in error. In *Mitjans*, we suggested that prudent investigators consider seriously either *or* both recording and transcribing statements. 408 N.W.2d at 831. Here, the statements were recorded. Thus, not transcribing the statements is not at odds with our pronouncement in *Mitjans*. *See id.*

As discussed in detail above, a number of errors were made in the translation of both the December 29 and 31 statements. There was no objection to the admission of either the two tapes or the two transcripts. In fact, there was a cautionary instruction given when the first transcript was introduced and appellant specifically requested that no cautionary instruction be given when the second transcript was introduced. Furthermore, the majority of the errors were minor, such as translating "stabbed" as "cut," but there were a few more serious errors. However, none of these errors changed the fundamental nature of appellant's confession. *See Dominguez–Ramirez*, 563 N.W.2d at 255 (declining to suppress a defendant's statement

where the interpretation errors may have caused the defendant's interrogation to take longer but did not make the confession coercive). That is to say, while some of the errors were more serious than others, the errors did not change the basic character of appellant's confession or compel him to confess. Instead, the errors were pointed out to the jury through testimony, corrected transcripts, arguments, and instructions.

The trial court was confronted with a difficult situation, but it went to great lengths to ensure that these errors did not deny appellant a fair trial. The court delayed the start of the trial and brought in an expert translator as soon as it was notified of the interpretation errors. The expert testified at length on direct and cross-examination about the errors. Portions of the tapes and transcripts were redacted. Additionally, when it denied appellant's motion to suppress the statements, the court indicated that it had thoroughly reviewed the transcript and that the quantity and quality of the errors did not merit suppression. In that ruling, the court also stated that it would admit "credible evidence of specific errors in the interpretation" at trial. The judge also instructed the jury that the tapes of the interrogation were the evidence and that the transcripts were merely an aid. Furthermore, the jurors were inundated with descriptions of the errors. Appellant's counsel spent a considerable amount of time detailing the errors during closing arguments, and the jurors were provided with the corrected transcripts during closing arguments and deliberation.

That is not to say that the trial court's approach should serve as a model in similar cases. The court knew that there were errors in the translation before the trial began and yet it admitted a transcript that both parties agreed contained some trans-

lation errors. The court either should have given the jury only the corrected transcripts or instructed the jurors to disregard the portions of the original transcript that contained the errors. The absence of such an instruction, however, is not critical to our analysis because the errors were described in detail to the jury. While the manner in which the court handled the interpretation errors was somewhat flawed, considering all of the facts, the admission of the December 29 and 31 tapes and transcripts was not a clear abuse of discretion and did not deny appellant his due process right to a fair trial.[7]

### IV.

■■■■ The final issue is whether the trial court unfairly exaggerated appellant's criminality when it imposed a consecutive sentence for the second-degree murder of an unborn child conviction. We generally "will not interfere with a trial court's discretion in sentencing unless the sentence is disproportionate to the offense." *State v. Hough*, 585 N.W.2d 393, 397 (Minn.1998). "A trial court's decision regarding permissive, consecutive sentences will not be disturbed unless the resulting sentence unfairly exaggerates the criminality of the defendant's conduct." *Id.* A trial court may impose separate sentences "when a defendant is convicted of multiple felonies involving more than one victim" even if the convictions arise from a single behavioral incident. *State v. Sanders*, 598 N.W.2d 650, 656–57 (Minn.1999); *see also* Minn. Sentencing Guidelines II.F.2. We have "consistently affirmed the imposition of consecutive life sentences" in multiple victim homicides. *State v. Wilson*, 539 N.W.2d 241, 246 (Minn.1995). Considering the facts of this case, a consecutive sentence of 306 months for second-degree murder of an unborn child is not disproportionate to the offense and does not unfairly exaggerate appellant's criminality.

Affirmed.

PAUL H. ANDERSON, Justice (dissenting).

I respectfully dissent. I do so because I do not agree with the majority on two key issues. First, the district court erred when it gave its jury instruction defining "past pattern of domestic abuse" because the instruction does not clearly state that more than one prior act of domestic abuse is required for there to be a past pattern. Second, the district court erred when it permitted the original error-ridden transcripts of Sanchez–Diaz's interrogations to be submitted to the jury. Together, these errors denied Sanchez–Diaz a fair trial.

Sanchez–Diaz was convicted of first-degree domestic abuse murder under Minn. Stat. § 609.185(6) (2002). Section 609.185(6) reads as follows:

**609.185 MURDER IN THE FIRST DEGREE.**

(a) Whoever does any of the following is guilty of murder in the first degree and shall be sentenced to imprisonment for life:

\* \* \* \*

(6) causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under cir-

---

**7.** The dissent does not cite any substantive interpretation error that goes to a critical element of the crime. The central issue is of guilt. Appellant did not deny that he stabbed the victim. While the quality of the translation could have been better, to reverse on translation errors that have no weight or relevance to the issue of guilt, is to elevate form over substance and would redefine what it means to receive a fair and impartial trial.

cumstances manifesting an extreme indifference to human life; * * *.

In *State v. Grube,* we considered the meaning of the phrase "past pattern of domestic abuse" and we stated that "[a] lone act, under any reasonable definition of the word 'pattern,' does not and cannot constitute a pattern." 531 N.W.2d 484, 491 (Minn.1995). For Sanchez–Diaz to be convicted as charged, the jury needed to find that he committed two or more past acts of domestic abuse. Because of the jury instructions the court gave, we have no way of knowing whether the jury actually reached such a conclusion.

The court presented the jurors with the following definition of "past pattern of domestic abuse":

prior *acts* of domestic abuse which form a reliable sample of observable traits or *acts* which characterize an individual's behavior. *No specific number of prior acts is required.*

In this case, in deciding whether there has been a past pattern of domestic abuse, you must only consider *acts* of the defendant, if any, that occurred before December 29, 2001.

(Emphasis added.) This instruction is not found in the Minnesota CRIMJIG; however, the language in the first two sentences is identical to the language used by the district court in *State v. Robinson,* 539 N.W.2d 231, 236 (Minn.1995). In *Robinson,* we concluded that the absence of a precise statutory definition for "pattern" did not render section 609.185(6) unconstitutionally vague. *Id.* at 237. Unfortunately, we did not comment on the validity of the specific instruction.

The majority concludes that the instruction "was sufficient to convey the message to the jury that more than one act was required in order to find a past pattern of domestic abuse." In support of this conclusion, the majority relies on the fact that the plural word "acts" appears in the instruction three times. But such an analysis ignores the impact of the following sentence: "NO specific number of prior acts is required." The majority concedes that this sentence is "troubling." Reduced to its most basic form, this sentence says, "No specific number is required." The majority asserts that the instruction's intended meaning is saved by the definition of pattern, the context surrounding this sentence, and the use of the word "acts." I submit that this is not so and to illustrate my point, I urge consideration of the following sentences when read standing alone:

"No specific number of persons is required."

"No specific number of widgets is required."

"No specific number of [whatever] is required."

As I read these illustrative sentences, it is clear to me that no specific number of persons, widgets, or whatever is required; thus, less than two will obviously satisfy the requirement. For this reason, the inclusion of the sentence, "No specific number of prior acts is required," makes the instruction ambiguous at best.

Jury instructions must fairly and correctly state the applicable law. *Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 147 (Minn.2002). First-degree domestic abuse murder is a serious offense for which the penalty is life in prison. To give the jury an instruction that permits a conviction without a clear requirement that there must be at least two prior acts of domestic abuse is plain error.

The district court also erred when it permitted the original error-ridden transcripts of Sanchez–Diaz's interrogations to be submitted to the jury when the jury listened to the audiotape of the interrogations. Sanchez–Diaz's native language is Spanish. For this reason, it was necessary

to utilize the services of a Spanish/English interpreter when the police interrogated him. The record indicates that the police did make a diligent effort to retain a qualified interpreter. Nevertheless, the interpreter used by the police made numerous significant errors when interpreting. Sanchez–Diaz points out that there were more than 40 such errors, some of which have been detailed by the majority, some of which I detail here:

| Interpreter | Correct |
| --- | --- |
| cut | stabbed |
| argument | discussion |
| team of felonies | crime scene team |
| palpable | physical |
| shocked | scared |
| two years | two months |
| "six months" | did not know how far along victim's pregnancy was |
| "Where did you hit her?" | "Where did you stab the victim?" |
| "And I took it away from her, because she got scared and pushed-pulled back." | "And I * * * removed [the knife] from myself. Because she got scared and jumped back." |
| "When I pulled the knife out in the living room." | "When she—when I took the knife out of myself in the living room." |
| "And I was putting a sweater on [the] baby." | "And when I was changing the baby, I was putting on his jacket so I could leave." |
| "It was a fight that wasn't very serious." | "But it was a very serious fight." |
| Describing knife: "I think it's too big." | "because it wasn't very big, I think." |
| "I was angry that she had stabbed me. From the moment I stabbed her, at first, I thought that she had just hit me with her hand." | "I was mad that she had cut me. At the time I felt the cut, I—I didn't feel anything, I thought she'd hit me with her hand because I didn't turn." |
| Interpreter declined to interpret expletives. | Numerous expletives. |

Many of these errors qualify as textbook examples of how interpretation errors can compromise a defendant's right to be understood. Moreover, these errors potentially had a substantive bearing on Sanchez–Diaz's assertion at trial that Vazquez "verbally provoked" him and stabbed him in the chest as he was getting ready to leave the mobile home with the baby.

Accurate interpretation of a foreign language is as much an art as it is a science. Good interpreters are highly-skilled individuals. Unfortunately, such individuals are in short supply. This reality is juxtaposed against the reality of the need for an expeditious investigation of a crime, which need may require the police to proceed

under less than ideal circumstances. I find no fault with how the police proceeded with the interrogation of Sanchez–Diaz. They acted in a diligent and conscientious manner to obtain a qualified interpreter. I find fault, however, with how the original error-ridden transcripts of the interrogations were dealt with at trial.

At the time of trial, the interpretation errors were well-known to all parties. When informed by the court-appointed interpreter that the interpreter was concerned about "significant" interpretation errors, the district court properly asked the interpreter to review the audiotapes and to produce a transcript. This review revealed that there were indeed numerous significant interpretation errors. Despite everyone's knowledge of these "significant" errors and over the objections of defense counsel, the audiotapes of both the first and second interrogations were played for the jury while at the same time the jurors were provided with the original, error-ridden transcripts.

While I do not agree with the defense's claim that Sanchez–Diaz's interrogations should have been suppressed in their entirety, it was error to submit the original, error-ridden transcripts in their error-ridden form. *See State v. Dominguez–Ramirez*, 563 N.W.2d 245, 250 n. 2 (Minn. 1997). The errors in the transcripts were not Sanchez–Diaz's fault; rather, they were the result of the criminal justice system's failure to accurately interpret how he responded to questions during his interrogations. At trial, Sanchez–Diaz invoked his constitutional right not to testify; therefore, the interrogation transcripts provided the jury with its only insight into his state of mind. The result was that the jurors heard the inaccurate interpretation on the audiotapes as they followed along on the error-ridden transcripts. Only at the time of the defense's closing argument were the jurors given the corrected transcripts, after which they were sent off to deliberate with 227 pages to review and compare. Under such circumstances, it is highly likely that the jurors, after already having been distracted from the truth by the error-ridden transcripts, were overwhelmed, possibly confused, and may even have disregarded the correct transcripts and the substantive information they contained.

I do not find *Dominguez–Ramirez* to be persuasive authority for an affirmance. The key issue before us in *Dominguez–Ramirez* was whether the statement given by the defendant was involuntary because the interpreter's incompetence caused the interrogation to be coercive. 563 N.W.2d at 254. We concluded that while the interrogation errors were unquestionably serious, they were "few in number," did not make the "interrogation coercive," and did not make the interrogation "deceptive or stress-inducing." *Id.* at 255, 256. As a result, we held that the shortcomings of the interpreter did not make the interrogation coercive. *Id.* at 256. The issue here—the submission to the jury of error-ridden transcripts—is far different from the coerciveness of a defendant's confession.

Moreover, in *Dominguez–Ramirez,* a qualified interpreter listened to a tape recording of the police interrogation, translated the Spanish into English, and then made corrections to the transcript provided by the police. *Id.* at 250. A copy of this corrected transcript was admitted into evidence and provided to each juror. *Id.* at 250 & n. 2. Importantly, we cautioned district courts about providing jurors with copies of transcripts that are inaccurate. We said:

A copy of the interrogation transcript, as corrected * * * was admitted at trial and a copy was given to each juror. While it may be appropriate for a dis-

trict court to furnish jurors with copies of a transcript to assist them when a tape recording is played, ordinarily a transcript should not be admitted in evidence unless both parties stipulate to its accuracy and admission. *State v. Swanson*, 498 N.W.2d 435, 439 (Minn.1993) (following *State v. Olkon*, 299 N.W.2d 89, 103 (Minn.1980)).

*Dominguez–Ramirez*, 563 N.W.2d at 250 n. 2.

The majority concedes the manner in which the court dealt with the interpretation errors was "somewhat flawed." I would eliminate the qualifying adverb—it was flawed. The parties agreed that the transcripts were inaccurate, but did not agree on their admission. Yet, the court permitted the inaccurate transcripts to be submitted to the jury with the audiotape. Because the interrogation transcripts were ridden with numerous significant interpretation errors, their submission to the jury helped deny Sanchez–Diaz a fair trial.

For the foregoing reasons, I conclude that the district court made plain errors affecting Sanchez–Diaz's substantial rights. I would reverse and remand for a new trial.

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.